## Coal Creek Mining Co. *v.* Davis.

### (*Knoxville.* November 12, 1891.)

1. MASTER AND SERVANT. *Master not liable for injury to servant, when.*

   Davis, while engaged in firing the ventilation furnace in a coal-mine, was suffocated by smoke caused by the burning of certain wooden buildings, viz.: Engine-house, oil-house, and shed, situated at and near the entrance of the main entry of the mine. This entry was also the intake air passage. It was D.'s only way of escape from the furnace, situated one hundred and fifty feet from its terminus. D. was also required to exercise a general supervision over said entry and buildings. D. was an experienced miner, and undertook this employment with full knowledge of the situation and its perils.

   *Held:* The coal company is not liable for D.'s death, upon the assumption that said buildings were negligently located and improperly constructed, it appearing that it was the custom of well-regulated companies to use wooden buildings located as these were, and there being no proof that the fire resulted from the company's negligence.

2. SAME. *Engineer and fireman are fellow-servants.*

   But if the fire resulting in D.'s suffocation was caused by the negligence of the engineer in charge of engine at entrance of the mine, the company would not be liable, because the engineer and D. were fellow-servants.

3. SAME. *Fellow-servant doctrine and its limitations.*

   A servant undertaking any employment for compensation takes upon himself the risks and perils ordinarily incident to the performance of such service. He assumes, ordinarily, the risks and perils resulting from the negligence of his fellow-servants. This rule does not apply, however, (1) where the negligent fellow-servant bears to the injured servant the relation of a vice-principal, or (2) where the negligent and injured servants are engaged in separate and distinct departments of the master's service. This last—the different department—limitation has not been extended to other than employes of railway com-

Coal Creek Mining Co. *v.* Davis.

panies. Neither of these limitations have any application to the facts of this case.

Cases cited: Railroad *v.* Handman, 13 Lea, 425; Railroad *v.* Lahr, 86 Tenn., 341; Railroad *v.* Carroll, 6 Heis., 347.

4. CHARGE OF COURT. *As to fellow-servant doctrine.*

In a case where there are no facts calling for it, the Court should not embody in his charge the limitations upon the fellow-servant doctrine, and if he does it will constitute reversible error, where, upon the whole case, it appears that the jury were thereby misled and confused.

5. COAL-MINES. *Prohibition against use of inside furnace for ventilation construed.*

The statutory prohibition against the use of a furnace inside coal-mines for purposes of ventilation "where the coal-breaker and chute buildings are built directly over and covering the top of the shaft, for the purpose of producing a hot up-cast of air," applies to mines worked by shafts, and not to those worked by horizontal entries.

Act construed: Acts 1881, Ch. 170, Sec. 7.

FROM ANDERSON.

Appeal in error from Circuit Court of Anderson County. W. R. HICKS, J.

J. A. FOWLER and W. L. WELCKER for Davis.

HENDERSON & JOUROLMON, C. J. SAWYERS, and D. K. YOUNG for Coal Company.

LURTON, J. Mary Davis has recovered a judgment against the Coal Creek Mining Company for

Coal Creek Mining Co. *v.* Davis.

the death of her husband, Evan Davis, through alleged negligence of that company, in whose service he was at time of death.

At a former term a recovery in her favor was reversed—Judge Turney delivering the opinion—upon the ground that there was no evidence of negligence. Deceased met his death from suffocation, the result of smoke being carried into the mine where he was at work.

In support of appellee's judgment, very full and earnest argument has been made. It is insisted that certain buildings outside, but at main entrance of mine, were negligently located and improperly constructed. This mine was worked by means of a horizontal entry on the side of the mountain. This entry was likewise the intake air-way. The ventilation of the mine was accomplished by means of a furnace placed at terminus of outtake air passage. Above this furnace was an open shaft, through which an up-blast of hot air was continually passing out. The draught thus produced caused a current of fresh air to flow into the mine through the entry, which there permeated all the passages and chambers; thence into the outtake air passage to the point where the furnace was located and out through the open shaft. This outtake air-way was to the left of entry of mine and parallel with it. At the terminus the furnace was located, and this air passage was connected with the entry by a side passage used by Evan Davis as furnaceman. This was kept closed by

doors, that the intake of air might be forced entirely through the mine before passing into the outtake air passage. By way of this side passage it was only about one hundred and fifty feet from Davis' post of duty at the furnace to the entrance of mine at principal entry. To keep up the fire in this furnace was the principal duty of deceased. This, however, consumed but little of his time, and, being so near the mine entry, he was also charged with the duty of watching this entry and keeping loiterers away from the houses just outside. Outside this mine and connected with the entry were the engine-house, oil-house, and a shed over mouth of entry. By the burning of these buildings smoke was carried into the mine, which, after permeating the mine, at last, by the outtake draft, reached the furnace and suffocated deceased. His outlet, as before stated, was by a side passage into the intake air-way. But as this was first filled with smoke, his escape was cut off before he was aware of the intake of smoke.

It is urged that these buildings were of wood, and that they should not have been located so near the entry. This mine had been frequently inspected by the State Inspector of Mines and by him passed as properly constructed. It is true that he does say, as is most apparent, that if they had been of non-combustible material the danger of fire would have been avoided. But this would be equally true as to the timbers used inside the mine for supports. The burning of

such timbers would have probably produced the same result. Yet if wooden supports are commonly used for such work in well-managed mines the law would not predicate negligence upon failure to use non-combustible supports. Wooden buildings for the outside machinery of such mines was used by well-managed companies, according to the proof. If these buildings had been farther from the entry the danger from smoke in case of fire would have been diminished. But this danger was a minimum. There were two outlets to this mine, and when smoke was observed as coming in from the main outlet it was very easy for the miners to leave the mine by an independent outlet. This was not so as to Davis, for in case he remained at his furnace until the smoke reached him there, his escape would be cut off, as before stated. But one man of all the great force in this mine was to any great extent concerned as to where these buildings were located, and his duty called him outside frequently enough to enable him to observe what was going on at these buildings. The Mine Inspector did not complain of the location of these buildings, and states that at many well-regulated mines they were located as here. But, aside from all this, Davis was an old miner, thoroughly acquainted with this mine, and aware of the character and location of these buildings. With all his experience and knowledge, he must be taken to have willingly engaged in the service of this company, and to have taken upon

himself the risks incident to these buildings. Being in charge of the ventilation of this mine, he was peculiarly aware of the effect of an intake of smoke resulting from the burning of these buildings. He was necessarily aware that this smoke would only reach him after permeating and filling all the passages and chambers of the mine, and that his escape would be then cut off. This danger, while a slight one, was, in the nature of things, more apparent to him than to any other servant of the company. His Honor properly charged the jury upon the effect of his knowledge, and we must assume that the judgment is not predicated upon any negligence in this regard.

It is next insisted that the burning of these buildings was due to the negligence of the engineer in control of the engine and engine-house.

This engineer is shown to have been a prudent, careful, and skillful man. He was well known to Davis. Their duties brought them much in contact. We have scanned this record in vain for satisfactory evidence of negligence upon the part of this man. But, if it be admitted that there is evidence from which different minds might draw different results as to negligence of this engineer in the management of his furnace fire, then we reach the question as to whether appellant is, in law, responsible for an injury resulting to deceased from negligence of the engineer.

Were the deceased and this engineer fellow-servants? When one engages in the employment

·of another for compensation, he takes upon himself the risks and perils ordinarily incident to the performance of such service. One of these risks and perils so assumed is that resulting from the carelessness and negligence of other servants in the ·same employment. This is the general rule of the common law, and the common law is in force in this State unless changed by statute. This common law rule has been limited by reputable authority in one or more particulars, which it becomes necessary to consider in order to determine whether this case is affected by them. The first ·of these limitations is this: That if the servant has been injured by the negligence of a superior servant having a right to control, and, while executing the order of such superior about a matter in which the superior had a right to control, then such superior servant is, as to the inferior, a *vice-principal*, and his negligence is that of the master. The mere superiority of rank or wages does not determine the liability of the master for the negligence of such superior servant.

"In order to charge the master, the superior servant must so far stand in the place of the master as to be charged in the particular matter with the performance of a duty toward the inferior servant, which, under the law, the master owes to such servant." *Railroad* v. *Handman*, 13 Lea, 425. In the subsequent case of *Railroad* v. *Lahr*, 86 Tenn., 341, it was suggested that this statement furnished a rule which, rightly ap-

plied, would harmonize most of our cases on this subject.

Where there is proof tending to show negligence of a superior servant, whereby an inferior servant has been injured, the jury should be instructed that the mere superiority of grade or rank will not determine the liability of the common employer, but that they must look and see whether the negligence was in regard to some duty to the inferior imposed by law upon the master, and by the master intrusted to the negligent superior servant. If this be so, then the rule of *respondeat superior* applies, for such a superior stands in the shoes of the master, and is a vice-principal.

In this case the evidence does not show that this engineer was the superior of the deceased, or that the master had intrusted the discharge of any duty to this engineer with respect to the deceased. They were servants of a common master, and neither had any control over the other. This made them fellow-servants. Where there is no evidence tending to show injury by the negligence of a *superior* servant having control of the inferior, a trial Judge should not charge upon the effect of such negligence. He should content himself with the statement of the general rule, for a charge upon a limitation not involved tends to confusion, and leads to unjust verdicts in many cases. The charge in this case on the subject of fellow-servants covers twenty pages or more of the transcript. It is confused and contradictory. The

many decisions of this Court in cases involving limitations of the general common law doctrine are stated to the jury; and this, in effect, left the jury to determine for themselves the law of the case on this subject.   This was error.

The trial Judge, subject to appeal, is the absolute judge of the law, and this high responsibility can neither be divided with nor imposed on the jury.

It has been insisted that deceased and this engineer were in different and distinct departments of service, and that for this reason the fellow-servant rule does not apply.   This different department limitation has been adopted in this State, and exists in the law of some two or three others. The weight of authority is against it, as admitted by Judge Freeman in the opinion adopting it as the law of this State in regard to railway corporations.   *Railroad* v. *Carroll*, 6 Heis., 347.

The doctrine rests upon the theory that the vast extent of the business of railway companies has led to the division of their business into separate and distinct departments; that by reason of this division a servant in one branch or department has no sort of association or connection with one in another department; that this absence of association gives such servant no opportunity of observing the character of a servant in another department of labor, and no opportunity to guard against the negligence of such servant.   The want of consociation is the idea underlying this limita-

tion. This rule has not been extended by us beyond railway corporations, and we are not disposed to extend it further than to the class of employments to which it has been heretofore limited. It can have no application in this case, for between the deceased and the engineer there was the closest association, and, the reason for the limitation of the general rule not existing, the limitation has no application. The trial Judge should not have charged upon this limitation, it not being applicable to the case before him.

There was nothing in the facts of this case requiring a charge as to the duty of special diligence to guard against fire. The threats made by a disappointed contractor had not been communicated to any officer of the corporation, and no special duty could therefore arise by reason of such threats. The deceased was himself charged with the general duty of keeping away unauthorized persons from the buildings adjacent to the entry, and his duties were such that he could well give the greater part of his time to this added duty.

It was not negligence to use a furnace inside the mine. The prohibition contained in the Act of 1881 is: "That in no case shall a furnace be used inside of the mine where the coal-breaker and chute buildings are built directly over and covering the top of the shaft for the purpose of producing a hot up-cast of air." There were no buildings over the shaft by which the hot air

escaped. The Act was intended to apply to a case where the coal is taken out by a shaft. Here the coal was removed through an entry and not a shaft. Aside from this, the location of the furnace was not the proximate cause of the death of deceased, and it was therefore irrelevant to have considered this question. This mine had two outlets. The one through the adjoining mine, was an outlet within the express provision of the Act of 1881.

There is no evidence to support this judgment. For this reason, and for the errors in the charge, the case must be reversed and remanded.