In the Matter of **LEEDS HOMES,**
**INC., et al.**
No. 19987.

United States District Court
E. D. Tennessee, N. D.
July 3, 1963.

On Motion to Alter Judgment
Sept. 12, 1963.

---

Fowler, Rowntree & Fowler, Knoxville, Tenn., for trustee.

Schimberg, Greenberger, Krauss & Jacobs, Chicago, Ill., Frantz, McConnell & Seymour, Knoxville, Tenn., Waller, Lansden & Dortch, Nashville, Tenn., for National Acceptance Co. of America.

FRANK W. WILSON, District Judge.

National Acceptance Company of America has filed a proof of secured claim in this reorganization proceedings under Chapter X of the Bankruptcy Act. The Trustee disputes the validity of the claim upon the ground that the claimant has failed to comply with the foreign corporation laws of Tennessee and upon the ground of usury. The Trustee seeks to assert a counterclaim for both compensatory and punitive damages for the alleged wrongful seizure of property by National Acceptance Company of America.

The facts material to the issues here involved are largely undisputed. The Court finds them to be as follows. National Acceptance Company of America, herein referred to as "NAC," is a corporation organized under the laws of Delaware and qualified to do business in Illinois, Michigan, and Ohio. It has never qualified to do business in Tennessee. It maintains its principal office and place of business at Chicago, Illinois. NAC is in the finance business, its principal activity in this regard being the making of corporate factoring and inventory loans. It appears that it has maintained a volume of $300,000,000 to $400,000,000 in loans in recent years, these loans being made to borrowers located in 20 to 25 different states. NAC began making loans to borrowers outside of Illinois a few years back and within the past five or six years has extended its operations in this respect to the southeastern states, including Tennessee. Its business in the southeastern states is carried on both directly out of the Chicago Office and through the office of a subsidiary corporation in Atlanta, National Acceptance Company of Atlanta,.

as well as through agents resident in the various states. In the period from 1959 through 1962 NAC made a total of 78 loans to borrowers located in Tennessee. These loans ranged from $4,000 to $760,000 in size. In making its loans, NAC purports to operate under Section 4, Chapter 74, of the Illinois Revised Statutes which provides that there is no restriction on the interest that may be charged upon a loan to a corporation if the parties agree upon the same in writing. Of the 78 loans made to borrowers resident in Tennessee, all of the loans were made at interest rates in excess of 6%, and all but six of the loans were made at interest rates in excess of 12%. In addition to making loans, NAC establishes lines of credit and itself borrows from banks in the various states, including several banks in Tennessee. Although the president of NAC in his testimony was either somewhat vague and evasive, or otherwise uninformed as to the manner the company conducted its operation in Tennessee, it appears that during recent years NAC has maintained three or four agents, auditors (loan examiners), or salesmen resident in Tennessee, including one John Randolph, a loan examiner and auditor who resided in Chattanooga and who was active in the loan that is the basis of this lawsuit. It further appears that both loans to borrowers resident in Tennessee and credit from banks located in Tennessee are actively sought and solicited by advertisements, direct mail, telephone, and personal visits within Tennessee by officers and agents of NAC. For this purpose, in addition to the activity of resident agents, officers and agents of NAC appear to have been coming into Tennessee both from the Chicago Office and the Atlanta Office regularly and frequently during at least the three year period prior to the making of the loan here involved. A telephone listing in the name of NAC appeared in the 1962 Nashville, Tennessee telephone directory. When a prospective borrower was located, he was provided with forms and given assistance by a visiting agent or officer when necessary in the preparation of the loan instruments and was then instructed to mail the papers either to the Atlanta or Chicago Office of NAC. It appears that the policy or practice generally followed was to require the borrower to mail the loan papers to NAC, with final action upon the loan and, in event of approval of the loan, execution of the papers and disbursement of the loan by NAC at their Chicago Offices.

Leeds Homes, Inc., herein referred to as "Leeds," is a Tennessee corporation having its office and principal place of business in Knoxville, Tennessee. It has engaged in recent years in the construction and sale of shell homes, having made a very rapid rise in the field, until it was operating and maintaining sales offices in eight southern states by the latter part of 1961, including Tennessee, Louisiana, Mississippi, Alabama, Georgia, North Carolina, South Carolina and Virginia. In 1961 it had gross sales in excess of $11,000,000. Leeds organized some 50 or more wholly owned subsidiary corporations to carry out its operations in the shell home field. One such subsidiary was Builders Warehouse, Inc., herein referred to as "Builders," which operated a building and lumber supply business with its warehouse and offices located at Alcoa, Tennessee. Builders was used to supply building materials to Leeds for shell home construction within a radius of approximately 200 miles of Knoxville. Outside this area Leeds purchased materials from independent suppliers. Builders also sold to the general public, but 95% of its gross sales were to Leeds.

During the year 1961 and continuing into 1962 there appears to have been in the shell home industry a very large number of defaults by shell home purchasers, or at least this was the experience of Leeds. Approximately 95% of Leeds' home sales were on credit. This paper was in turn endorsed with recourse by Leeds and sold through another of its subsidiaries to outside financial institutions. With the large number of defaults in 1961 and 1962, Leeds was called upon to repurchase a large amount of this recourse paper. It repurchased over

$1,400,000 of such paper in 1961 and an additional $1,770,000 in the first six months of 1962. The liquid assets of Leeds, including $2,700,000 received from stock sales in 1961, when the stock was first publicly sold, were largely expended for this purpose. As a result, in early 1962 Leeds and its subsidiaries, including Builders, were short of cash.

It does not appear what the first contact between Builders and NAC may have been, or who made such contact, but on February 4, 1962, NAC sent John Randolph, its auditor resident in Chattanooga, Tennessee, to Builders' office in Knoxville and Alcoa to investigate with regard to a business loan and to assist Builders in filling out the loan application and loan papers. His contact in this regard was with Miles Siegel, who was then an officer of both Leeds and Builders. The two men worked out the loan papers and after the papers were executed upon behalf of Builders, Siegel mailed them to NAC's office in Chicago. Upon review of the papers and Randolph's report, NAC declined to make the loan but determined to investigate the matter further.

At Siegel's request, the loan papers were returned to Builders. Thereafter, upon February 19, L. H. Tayne, a vice president of NAC, went to Knoxville from Chicago to further pursue the loan and to further investigate the status of the accounts receivable from Leeds to Builders. As a result of his visit, it was understood that Builders would resubmit the loan application and papers sometime in March, as the need for the loan proceeds might arise. Under date of March 16, the loan papers were again mailed to NAC by Siegel. Included in these papers were some of the papers formerly submitted, including a factor's lending agreement bearing date of February 5, and other papers bearing date of March 16, and including a note for $150,000 which purported on its face to be payable on demand. The factor's lending agreement specified interest at a rate of ½ of 1% per day. The note merely referred to the factor's lending agreement for the applicable interest. All instruments were expressly stated to be made subject to Illinois law. An ink notation was added to the bottom of the note by Mr. Siegel, acting on behalf of Builders, to the effect that the note was conditioned upon receipt by Leeds of $150,000 "per attached letter." The letter referred to Siegel's understanding that repayment of the note would start in May 1962 at the rate of $10,000 per month until the loan was reduced to $100,000, at which time "we can review the situation further." As security for the note, Builders executed a lender's lien agreement pledging its inventory under the Tennessee Factor's Lien Law (64–1801 to 64–1807, T.C.A.) and an assignment of its accounts receivable and a guaranty of payment by Leeds. Upon receipt by NAC at Chicago of the letter and loan papers enclosed, there appears to have been some further negotiation by telephone between Chicago and Knoxville over the note and method of repayment. No clear understanding was had upon this, however, it being contended by NAC that the understanding was that the loan would be paid off in full each month and thereupon a new loan for $10,000 less would be made, the purpose of this arrangement being to assure NAC of Leeds' ability to pay its accounts to Builders monthly. On the other hand, Builders contended that the understanding was that the parties were merely to swap checks each month with the consequence of reducing the loan $10,000 a month until $100,000 remained due, whereupon they would negotiate with reference to further payments. However this may have been, NAC disbursed the loan of $150,000 by check dated March 21, 1962. Builders received the proceeds of the loan and immediately disbursed them to Leeds, purportedly in payment of accounts Builders owed Leeds. In this regard it appears that one of the security instruments executed by Builders to NAC was an assignment of the accounts receivable from Leeds in which it was reported that no offsetting accounts were due Leeds from Builders, but this assignment and the representations therein were described as merely

"academic" and "fluff" by the witness Siegel.

With regard to the repayment of the loan, and aside from any misunderstanding the parties may have had, the facts are that Builders paid NAC the sum of $10,000 upon May 21, 1962, which sum was applied to a reduction of the principal. No other payments of any kind have been made upon the loan.

About this time, one of Leeds' checks for an amount in excess of $40,000 was received by NAC from an outside source and it failed to clear the bank. NAC became concerned over Leeds' ability to meet its obligations to Builders. During this same period of time it came to the attention of NAC that a change in the management and officers of Leeds and Builders had occurred since the loan was made. Both the change in management and the failure of Leeds' check to clear were caused by difficulties and negotiations that Leeds was having over the sale and repurchase of its shell home paper to other financial institutions, particularly Pioneer Finance Company, who had stopped payment of a $170,000 check to Leeds. These latter matters do not appear to have been known to NAC at the time, however. Upon June 5, NAC again sent Mr. Randolph as its representative to investigate the condition of Builders and to determine whether further payments upon the note were to be forthcoming. He was advised by Builders that another payment would be made upon June 21. However, upon a visual inspection it appeared to Randolph that the inventory was being dissipated and that proper records were not being kept and he so reported to NAC. It was determined then that NAC should demand that a bonded warehouse be instituted by Builders to further secure NAC's security interest in the inventory. Mr. Randolph was under the impression that Builders agreed to this and the following day a further representative of NAC, Mr. Crogden, and a representative of Lawrence Warehouse Company came to Builders to institute the bonded warehouse. At this point, Builders refused to place the inventory under a bonded warehouse. NAC then demanded a payment upon the note, either in full or in part. Again Builders refused, insisting that a $10,000 payment would be made upon June 21. Thereupon NAC instituted a replevin action upon June 7, 1962 in this court, jurisdiction being based upon diversity and the action being Civil Action No. 4477, *National Acceptance Company of America v. Builders Warehouse, Inc.* A $200,000 replevin bond was posted upon the basis of Mr. Crogden's estimate by visual inspection that the inventory would bring $100,000 upon a forced sale, and NAC took full possession of the inventory by taking possession of the warehouse and placing it under guard upon the writ of replevin.

Upon June 16, 1962, Leeds and its subsidiaries, including Builders, filed the petition for reorganization under Chapter X of the Bankruptcy Act. Further action in the replevin suit was stayed and a petition was shortly filed by the Trustee to have possession of the inventory surrendered to the Trustee. Before a hearing upon this petition, a stipulation was entered into by the parties wherein it was agreed that possession of the inventory would be surrendered to the Trustee, but the control and liquidation of the inventory would be accomplished under agreed conditions, with the proceeds of any sales being held in an escrow account subject to the lien rights, if any, of NAC. After reserving the rights of both parties, the replevin action was dismissed upon July 25, 1962. NAC then filed its proof of claim as a secured creditor upon August 14, 1962, and the Trustee has duly responded thereto and filed a counterclaim for damages alleged to have been caused by NAC having wrongfully instituted the replevin action and precipitated these bankruptcy proceedings.

Further findings of fact, including matters relating to interest, costs, and attorney fees, if any, that NAC may be entitled to and including damages, if any, that the Trustee may be entitled to, are reserved to a later part of this opinion as

it may become appropriate to consider these matters.

Although the facts are largely undisputed, the issues of law raised by the parties are many and complex and the conclusions to be drawn from the facts are disputed. A statement of the contentions of the parties is in order at this time. As stated at the beginning of this opinion, the Trustee makes two basic contentions with regard to the validity of NAC's claim. The first contention is that the claim is void by reason of NAC's failure to qualify as a foreign corporation under the laws of Tennessee. The second contention is that the claim is void as having been made in violation of the usury laws of Tennessee.

With respect to the defense that the claim of NAC is void under the foreign corporation laws of Tennessee, the parties make the following contentions:

(a) The Trustee contends that NAC was a non-qualifying foreign corporation doing business in Tennessee at the time the subject loan was made and that its contracts with Builders are therefore void, whereas NAC contends that irrespective of whether it was or was not in violation of the Tennessee foreign corporation laws, in no event would this prevent enforcement of its claim in a bankruptcy proceedings as distinguished from a diversity action, to which in turn the Trustee responds by contending both that the non-qualifying corporation defense would in any event apply in bankruptcy proceedings and that under the stipulation dismissing the replevin action all defenses available in the replevin suit, which was a diversity case, would be available in these proceedings.

(b) The Trustee contends both that the loan was made in Tennessee, and thus not interstate, and that even if it were interstate, the general activities of NAC were such as to require that it qualify under the Tennessee foreign corporation laws, whereas NAC contends that irrespective of whether it was a foreign corporation doing business in Tennessee, this particular transaction was an interstate transaction and thus exempt from the Tennessee foreign corporation laws.

(c) The Trustee contends and NAC denies that it was doing business in Tennessee so as to be subject to the Tennessee foreign corporation laws.

With respect to the defense that the loan was usurious, the Trustee contends that the transaction was governed by the Tennessee usury laws in that the contract was made in Tennessee, and further that, irrespective of where the contract was made, the Tennessee usury laws would apply as the attempt to make the Illinois usury laws applicable was a mere ruse and invalid device to evade the Tennessee usury laws. On the contrary, NAC contends that there was no usury, as the Illinois law applied, and further that even if the Tennessee usury laws applied, the usury did not appear on the face of the note so that NAC was entitled to enforce the note and collect interest at the legal rate in Tennessee.

With respect to the replevin suit, and aside from the validity of NAC's claim under the foreign corporation and usury laws of Tennessee, the Trustee asserts the actions of NAC in wrongfully initiating the replevin suit both as a defense to NAC's claim and as a basis for a counterclaim by the Trustee. It is the contention of the Trustee that the replevin action was wrongfully and maliciously initiated by NAC and that as a result the Bankruptcy Court, in exercise of its inherent equity powers, should both deny interest, costs, and attorney fees to NAC and subordinate NAC's claim to the extent of the damage thus occasioned to the bankruptcy estate. By way of counterclaim, the Trustee asserts that the actions of NAC in instituting and pursuing the replevin action amounted to malicious prosecution, for which the Trustee is entitled to recover both compensatory and punitive damages. In response to these contentions of the Trustee, NAC asserts that the replevin was not wrongful.

The further contentions of the parties relate to the costs and attorney fees, if

any, due unto NAC and the measure and elements of damage to which the Trustee may be entitled under the counterclaim. A statement of these contentions will be reserved until it may become appropriate to consider them.

▮ Turning the attention of the Court to the contentions of the parties in the order in which they are stated above, the Court must first resolve the issue of whether the contention that NAC was a non-qualifying foreign corporation under Tennessee law may be asserted in these bankruptcy proceedings to defeat NAC's claim as a secured creditor. The basic question here to be considered is whether the defense that a creditor is a non-qualifying foreign corporation can be asserted in the bankruptcy court to defeat the creditor's claim. It appears to be well settled that the validity of a claim, other than one created by federal law, such as a patent or a copyright claim,[1] must be tested by reference to state law.[2] The rule in this regard was stated in a concurring opinion in the case of Vanston Bondholders Protective Committee v. Green, 329 U.S. 156, 67 S.Ct. 237, 91 L.Ed. 162 (1946), as follows:

"And no obligation finds its way into a bankruptcy court unless, by the law of the State where the acts constituting a transaction occur, the legal consequence of such a transaction is an obligation to pay. * * "

NAC does not dispute this legal premise. The parties do dispute, however, whether, by Tennessee law, the contracts of a non-qualifying foreign corporation are void or merely unenforcible within the state courts, and even if the latter be the case, whether the rule of non-enforcibility would apply so as to bar a claim in a reorganization action in a bankruptcy court. With regard to the problem here involved, the Supreme Court held in the case of Lupton's Sons Co. v. Automobile Club, 225 U.S. 489, 32 S.Ct. 711, 56 L.Ed. 1177 (1912) that the fact that a non-qualifying foreign corporation could not sue in the courts of the State of Mississippi, where its contracts were not void but only unenforcible, did not deny to the corporation the right to sue on such contract in the federal courts. However, in the cases of Angel v. Bullington, 330 U.S. 183, 67 S.Ct. 657, 91 L.Ed. 832, and Woods v. Interstate Realty Co., 337 U.S. 535, 69 S.Ct. 1235, 93 L.Ed. 1524, the Court held that the rule stated in the case of Lupton's Sons had become obsolete insofar as it was based on a view of diversity jurisdiction which came to an end with Erie Railroad v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, and that the holding in the Erie Railroad case precluded maintenance in the federal court in diversity cases of suits to which the state had closed its courts. Thus, in diversity actions the claim of a non-qualifying foreign corporation may be defeated in a federal court the same as in a state court, regardless of whether the state law is that the claim is void or merely unenforcible. It should be noted that in both the Angel case and the Woods case the rule in the Lupton's Sons case is expressly overruled only as to diversity actions. This would appear to leave the rule in the Lupton's Sons case in effect in federal court actions where jurisdiction is not dependent upon diversity. Since jurisdiction in a bankruptcy action, such as the instant case, is not dependent upon diversity, the rule would appear to be that the claim of a non-qualifying foreign corporation in a bankruptcy court could not be defeated where the law of the state where the claim arose merely renders contracts of a non-qualifying foreign corporation unenforcible in the courts of that state, but that such a claim would be denied in bankruptcy court if the law of the state where the claim arose renders the

1. Lyon v. Quality Courts United, Inc., C. C.A.6, 249 F.2d 790. See also United States v. Malan Construction Corp., D. C., 168 F.Supp. 255.

2. Remington on Bankruptcy, Vol. 2 (1956), Sec. 955–956; Moore's Federal Practice, Vol. 1A, Sec. 0.310, p. 3403 and Sec. 0.322, p. 3724–28; 6 Am.Jur., Bankruptcy, Sec. 459.

contracts of the non-qualifying foreign corporation void.[3]

Such a difference in the rule in federal courts as between suits based upon diversity and those where jurisdiction is not based upon diversity is not without reason. In a diversity action, where the non-resident party may elect the forum in which the suit is brought, a different rule would lead to forum shopping. However, in a bankruptcy action, the jurisdiction of the Bankruptcy Court may be, as it here is, exclusive. The fact that a different result may be reached, dependent upon whether the claim is asserted in the bankruptcy court or in a state court, is not of itself a justification for an elimination of the bankruptcy court rule as here stated, particularly when it is recognized that the consequence of the rule enforced in the state courts may be to effect a forfeiture.

 The Trustee contends that although this is a proceedings in bankruptcy, it is equivalent to and must be treated as a diversity action in that the former replevin action was based upon diversity and by stipulation all of the rights of the parties under that action were reserved to these proceedings. The fallacy in this argument is that the parties cannot by stipulation confer jurisdiction upon the Court or alter the law with reference to jurisdiction. This proceedings is not a diversity action. Jurisdiction is conferred by the Bankruptcy Act. The stipulation of the parties has reserved to these proceedings all issues with reference to the lien rights, if any, of NAC and the alleged wrongfulness of the replevin, but does not and could not either confer or take away jurisdiction of the Bankruptcy Court.

 In the light of the conclusions here reached, the Court must look to the law of the State of Tennessee to determine whether that law renders the contract of a non-qualifying foreign corporation void on the one hand or merely unenforcible in the courts of the state upon the other hand. In resolving this issue, the case law of Tennessee must be looked to, as the only statutory prohibition is contained at Sec. 48–908 T.C.A., which declares it "unlawful for any foreign corporation to engage in intrastate business in this state" without qualifying and provides a monetary penalty for violation. Numerous cases have construed this to render void or deny enforcement to any contract made by a non-qualifying foreign corporation. A careful reading of these cases leads this Court to conclude that the rule established by the Tennessee cases is that contracts entered into by non-qualifying foreign corporations are not void, but rather are unenforcible at the instance of the offending corporation in the courts of the state. The foreign corporation law of Tennessee was first enacted in 1891. While some of the cases since then do make the statement that such contracts are "void,"[4] this statement is made without discussion in cases where no issue is raised that would require a distinction to be made between void contracts and contracts unenforcible at the instance of one of the parties. Such contracts, however, are held to be enforcible at the instance of the non-offending party by suit against the stockholders of the offending foreign corporation as partners.[5] Although the Court had stated in the early case of Cary-Lumbard Lumber Co. v. Thomas, 92 Tenn. 587, 22 S.W. 743 (1893) that contracts by offending foreign corporations were illegal and "no rights or remedies can be predicated thereon in favor of the company," this decision has been discussed and carefully limited by subsequent cases. For example, in the case of Singer Mfg. Co. v. Draper and Looney,

---

3. See In re V-I-D, Inc., 198 F.2d 392 (C. C.A.7, 1952), Cert. Den. 344 U.S. 914, 73 S.Ct. 337, 97 L.Ed. 705 (1953).

4. Insurance Co. v. Kennedy, 96 Tenn. 711, 36 S.W. 709; Peck-Williamson Heating & Ventilating Co. v. McKnight & Merz,

140 Tenn. 563, 205 S.W. 419; State Life Ins. Co. v. Dupre, 19 Tenn.App. 301, 86 S.W.2d 894.

5. Cunnyngham v. Shelby, 136 Tenn. 176, 188 S.W. 1147, L.R.A.1917B (1960).

103 Tenn. 262, 52 S.W. 879 (1899) the Court stated:

"It must be borne in mind that, as between the parties, the contract is not void, and the principle which prevents the plaintiff's recovery is that the courts will not lend their aid to enforce contracts and transactions made in fraud and violation of its laws, and which it has impliedly prohibited. * * *"

In the case of Biggs v. Reliance Life Ins. Co., 137 Tenn. 598, 195 S.W. 174 (1917), the Court, in referring to the Lumber Co. case, stated:

"It was there held that where a foreign corporation had failed to file a memorandum of its charter as required by Acts 1891 * * * all contracts made by it in this state were illegal, and that the corporation could have no recovery thereon. It was not held that the contract was void for every purpose. It has never been ruled by this court that a contract so entered into was so far void as to be unenforcible by the other contracting party. The contrary was indicated in the later case of Singer Mfg. Co. v. Looney, 103 Tenn. 262, 52 S.W. 879, * * *."

See also Chattanooga R. & C. R. Co. v. Evans, 66 F. 809 (C.C.A.6, 1895) and Caesar v. Capell, 83 F. 403 (C.C.A.6, 1897) where the Cary-Lumbard Lumber Co. v. Thomas case was construed as not rendering contracts void or declaring forfeitures in all instances. Other cases repeatedly refer to such contracts as not being "enforcible" in the courts of the state by the offending corporation.[6] It is therefore the conclusion of this Court that the law of Tennessee is that contracts and transactions of foreign corporations acting in violation of the qualifying laws of the State are not void, but rather are unenforcible in the courts of the State at the instance of the offending corporation. The inhibitions against enforcement applicable to state courts not being applicable to a federal court where jurisdiction is based on the Bankruptcy Act, and not on diversity, the claim of NAC accordingly cannot be defeated in a bankruptcy court upon the ground that the creditor was a non-qualified foreign corporation under Tennessee law.

Moreover, the results thus reached that the foreign corporation laws of Tennessee would not operate to defeat NAC's claim as a secured creditor is further required under the facts of this transaction as the Court finds them to be. Although a strong case is made out with regard to NAC having done a substantial portion of its loan business within Tennessee and although the contention of the Trustee is not without merit that the general policy of NAC requiring the borrower to mail the loan papers to Chicago for final action is a mere ruse to evade the foreign corporation laws of Tennessee, the Court can only conclude that, under the facts surrounding the making of this loan, the loan was bona fide completed in Chicago and this particular transaction was an interstate transaction. As shown by the testimony of the witness Siegel, when he forwarded the loan papers to Chicago acting on behalf of Builders, he expressly made the note subject to the conditions of the letter attached. The conditions of the attached letter were not merely the receipt of $150,000 and thus a condition implied by law as argued by the Trustee, but rather related to the method and rate of repayment, a very material part of the agreement. The letter in effect constituted an offer that was acted upon by NAC, after further negotiations, in Chicago, the acceptance being bona fide made there and not merely as a ruse or design to evade the Tennessee foreign corporation laws. This particular transaction being an interstate transaction, the defense of non-qualifying foreign corporation would not be available and NAC would be exempt from the Ten-

---

6. Harris v. Water & Light Co., 108 Tenn. 245, 67 S.W. 811 (1901); Advance Lumber Co. v. Moore, 126 Tenn. 313, 148 S.W. 212 (1912); Thomas Co. v. Grosvenor, 144 Tenn. 347, 233 S.W. 669 (1920).

nessee foreign corporation laws with regard to this loan, irrespective of its obligation to qualify by reason of other business done in the State.[7]

The conclusion that the particular contract here involved was actually and bona fide completed in Chicago also largely disposes of the Trustee's contention that the Tennessee usury laws would apply and would render the contract void. The Trustee concedes that if a loan is consummated in good faith in a foreign state, made repayable in the foreign state, and the loan papers specify that the laws of the foreign state are to govern the contract, then the laws of the foreign state would govern the interest that might be charged. The Trustee contends that the subject loan was purportedly made subject to Illinois law, but that this was for the fraudulent and bad faith purpose of evading the Tennessee usury laws and the Trustee cites authority that loans so fraudulently made will fail of their purpose and will be subject to the Tennessee usury laws.[8] However, when it is determined that the subject loan contract was bona fide executed in Chicago and this is considered together with the fact that the loan was to be repaid in Chicago, and the fact that it appears upon the face of the agreements that the parties contracted to have the Illinois law with regard to usury apply, the Court can only conclude that this particular agreement was not made in bad faith and fraudulently to evade the Tennessee usury laws, that the parties intended that the Illinois laws should apply, and that the Illinois law would govern the rate of interest that might be charged.[9]

Having concluded that neither the non-qualifying foreign corporation defense nor the usury defense would defeat the validity of NAC's claim, there remains to be considered the Trustee's contentions with regard to NAC's wrongful action in instituting the replevin suit and the consequences, if any, this would have upon the rights of NAC as a secured creditor as well as the Trustee's right to either compensatory or punitive damages.

Considering again the circumstances under which the replevin action was instituted, as heretofore found by the Court, while it cannot be said that NAC's actions in initiating the replevin were commendable, neither can it be said that they were malicious or legally wrongful. The note was on its face a demand note. Whether this was altered by agreement of the parties with regard to installment payments is not necessary to decide, for the contract expressly provided that if NAC deemed itself insecure at any time it could demand immediate payment. That NAC had cause to deem itself insecure appears from the record. Builders' ability to pay was almost wholly dependent upon Leeds' ability to pay. That Leeds was in financial difficulty was apparent both from the failure of its check to clear the bank and from the complete change in management. The apparent depletion of Builders' inventory and the refusal of Builders to permit its inventory to be placed under a bonded warehouse or to make a part payment on the loan were all matters which might reasonably be calculated, when considered together, to cause NAC to feel insecure. At any rate, the Court cannot say that NAC acted without probable cause or that it acted maliciously in instituting the replevin action. Its actions in this regard did not constitute malicious prosecution. Moreover, while it cannot be doubted that the replevin was an immediate precipitating factor in the decision of Leeds

---

7. Thomas Co. v. Grosvenor, 144 Tenn. 347, 233 S.W. 669; Hollingshead Co. v. Baker, 4 Tenn.App. 362; Burton Explosives, Inc. v. Strider, 25 Tenn.App. 440, 158 S.W.2d 731.

8. Deaton v. Vise, 186 Tenn. 364; 210 S.W. 2d 665; Providence A. M. E. Church v. Sauer, 45 Tenn.App. 287, 323 S.W.2d 6.

9. Bowman v. Price, 143 Tenn. 366, 226 S.W. 210; Union & Planters Bank & Trust Co. v. Evans, 8 Tenn.App. 63.

and its subsidiaries to file this reorganization proceeding, neither can it be doubted that the financial problems occasioned by the default of large numbers of shell home purchasers and the consequent requirement of repurchase of this paper by Leeds was the real source of the financial difficulties that occasioned this reorganization. Leeds and Builders were in fact in serious financial straits at the time of, and wholly apart from, the filing of the replevin action. There was good cause for any creditor aware of the facts to feel insecure.

Interest as provided in the contract will be allowed at the rate of ½₄ of 1% per day upon the daily balance outstanding. Interest will be allowed only to the date of the filing of the reorganization petition.[10] Attorney fees and costs incident to the replevin action only will be allowed. No costs or attorney fees will be allowed incident to the reorganization proceedings. The Court finds these replevin costs to be $4135.99 and reasonable attorney fees for the replevin action only to be $2340.00. Interest, costs, and attorney fees will be allowed only out of the proceeds of the collateral after the same shall have first been applied to the payment of the principal claim. The principal claim will be allowed in the sum of $140,000. The Court will withhold any decision with regard to the further foreclosure or liquidation of any remaining inventory pending an agreement between the parties upon this or otherwise pending further briefs of the parties upon this issue. The parties will consult with a view to submitting an agreed order in this regard within ten days of the filing of this opinion or will submit further briefs within 20 days of the filing of this opinion. The entry of an order in accordance with this opinion will await the resolution of the issue of the foreclosure and disposition of the inventory and collateral. This opinion will constitute the findings of fact and conclusions of law in the case.

## ON MOTION TO ALTER JUDGMENT

In accordance with the opinion of the Court filed in this cause upon July 3, 1963, a judgment was duly entered. NAC has now filed a motion seeking to alter the judgment with respect to the disallowance of interest and attorney fees after the date of filing the reorganization petition. It is contended by NAC that, as a secured creditor, it should have been allowed interest to the "date of payment" and that the Court was in error in disallowing interest from and after the date of the petition in bankruptcy. NAC further asserts that the Court was likewise in error in disallowing attorney fees and costs due it after the date of the bankruptcy proceedings. The Court, in allowing interest and attorney fees prior to the institution of the bankruptcy proceedings, but disallowing such interest and attorney fees after the filing of the petition in bankruptcy, relied upon the case of Vanston Bondholders Protective Committee v. Green, 329 U.S. 156, 67 S.Ct. 237, 91 L.Ed. 162 (1946). NAC contends that a secured creditor is entitled to interest on its claim at the rate provided for in its contract with the debtor until the date of payment of the claim if the value of the property securing the debt is sufficient to pay the principal and such interest. As pointed out by NAC, this rule was established by a line of cases prior to the Vanston case. See Coder v. Arts, 213 U.S. 223, 245, 29 S.Ct. 436, 53 L.Ed. 772 (1909); Sexton v. Dreyfus, 219 U.S. 339, 346, 31 S.Ct. 256, 55 L.Ed. 244 (1911); Ticonic National Bank v. Sprague, 303 U.S. 406, 58 S.Ct. 612, 82 L.Ed. 926 (1938); Consolidated Rock Products Co. v. DuBois, 312 U.S. 510, 527, 61 S.Ct. 675, 85 L.Ed. 982 (1941); Institutional Investors v. Chicago, M., St. P. & P., 318 U.S. 523, 546, 63 S.Ct. 727, 87 L.Ed. 959 (1943). It is also contended by NAC that the Vanston case did not change the rule in the Coder, Sexton, and Ticonic cases, but that, as shown by cases subsequent to the Van-

10. Vanston Bondholders Protective Committee v. Green, 329 U.S. 156, 67 S.Ct. 237, 91 L.Ed. 162 (1946).

ston case, the rule allowing interest to a secured creditor out of the security remains the law applicable to bankruptcy proceedings, including reorganization proceedings. See In re Macomb Trailer Coach, Inc., 200 F.2d 611 (C.C.A.6, 1952); Kagan v. Industrial Washing Machine Corp., 182 F.2d 139 (C.C.A.1, 1950); Palo Alto Mutual Savings & Loan Association v. Williams, 245 F.2d 77 (C.C.A.9, 1957) overruling Beecher v. Leavenworth State Bank, 192 F.2d 10 (C.C.A.9, 1951); Eddy v. Prudence Bonds Corp., 165 F.2d 157 (C.C.A.2, 1947). It is the position of NAC that the Vanston case is authority only for the proposition that a bankruptcy court may disallow interest upon interest to a secured creditor from the security proceeds, even though such proceeds are adequate to permit such payment. While this was the specific result reached in the Vanston case, this Court is of the opinion that the legal principle announced in the Vanston case cannot be limited only to the factual situation where interest upon interest is involved. Rather, the Court there spoke of the duty of the bankruptcy court "to determine how and what claims shall be allowed under *equitable principles.*" (Emphasis supplied). The Court explained the rule allowing interest to secured creditors out of the security by stating:

> "But where an estate was ample to pay all creditors and to pay interest even after the petition was filed, equitable considerations were invoked to permit payment of this additional interest to the secured creditor rather than to the debtor. Coder v. Arts, 213 U.S. 223, 245 [29 S.Ct. 436, 53 L.Ed. 772]; Sexton v. Dreyfus, supra. See also Johnson v. Norris [C.C.A.5], 190 F. 459."

The Court went on to state:

> "It is manifest that the touchstone of each decision on allowance of interest in bankruptcy, receivership and reorganization has been a balance of equities between creditor and creditor or between creditors and the debtor."

The Vanston case, as read and understood by this Court, is authority for the principle that a bankruptcy court, having equity powers, is permitted to exercise some discretion in the allowance of interest to secured creditors after bankruptcy, having due consideration for the facts of each case and after weighing the rights and interests of all creditors. The rule is stated thus in 8A C.J.S. Bankruptcy § 242(8):

> "§ 242(8). Interest and Fees Interest after bankruptcy. Whether interest continues to run after bankruptcy is a federal question. Although there is some authority to the effect that a secured creditor is not entitled to have from his security interest accruing after the filing of the petition in bankruptcy, generally, where a valid and unavoidable lien of a secured creditor secures the payment of both principal and interest, and the security or its proceeds are sufficient for that purpose, the creditor is entitled to obtain or take from the security or its proceeds, as against the trustee in bankruptcy, not only the interest accruing before the filing of the petition in bankruptcy, but all interest up to the date the debt is paid. *However, it would appear that the matter rests in the discretion of the bankruptcy court which, after balancing the equities involved, may disallow post-bankruptcy interest even though it can be paid out of the security.* * * *" (Emphasis supplied).

In the case of Pacific States Corp. v. Hall, 166 F.2d 668 (C.C.A.9, 1948), as to post-bankruptcy interest the Court there stated:

> "Appellant contends interest should be allowed subsequent to the filing of the petition in bankruptcy. As a general principle, in bankruptcy and equity receiverships, interest on the debtor's obligations ceases to accrue at the commencement of the proceedings, Thomas v. Western Car Co., 149 U.S. 95, 13 S.Ct. 824, 37 L.Ed. 663. Appellant insists, how-

ever, that equitable principles may be invoked to award interest to a secured creditor subsequent to the filing of a petition in bankruptcy where the value of the security is in excess of the principal and interest due, and where such award will not be unfair to subordinate creditors. Vanston Bondholders Protective Committee v. Green, 329 U.S. 156, 67 S.Ct. 237 [91 L.Ed. 162]. From the record before us, the value of the security and the relative equities between the secured creditor and the subordinate creditors cannot be determined. * * * "

That the allowance of interest to a secured creditor out of the security is a matter, not of a hard and fast rule, but rather of the equitable considerations under the facts of the particular case, is further supported by the holding of the Court in the case of In re Magnus Harmonica Corporation, 262 F.2d 515 (C.C.A.3, 1959). In dealing with this problem, the Court there stated:

"We deal here only with interest following the institution of the reorganization proceedings. We are cited to the rule that interest is not recoverable after such a proceeding has begun and to the exception that the rule does not apply when the creditor is secured above the amount of his principal debt.

 * * * * * *

"With regard to that part of the interest claim which is within the terms of the contract, we have a closer question. A bankruptcy court is one with equity powers and has a measure of discretion in their exercise. Vanston Bondholders Protective Committee v. Green, 1946, 329 U.S. 156, 67 S.Ct. 237, 91 L.Ed. 162. In this particular case equitable considerations do not favor giving the claimed payment to this secured creditor. It made overcharges against the debtor outside the terms of the contract and it is only because the debtor is precluded from complaining that the trustee is bound by the debtor's inaction. Such equities as are apparent favor the trustee acting for the general creditors as against Credit. Both the referee and the district judge made an accurate application of equitable principles. * * * "

See also 9 Am.Jur.2d, Bankruptcy, Section 483.

■■■ Turning then to the equity of allowing interest to NAC in accordance with the contract between NAC and the debtor at the rate of ½₄ of 1% a day from and after the filing of this bankruptcy action to the date of payment, not only does it fail to appear in the record that the security will be adequate to pay such interest after payment of the principal, but this Court is of the opinion that such a result would be inequitable and unconscionable when the rights of other creditors are considered. Interest at the rate of ½₄ of 1% a day is in excess of 15% per annum. If interest upon interest is inequitable unto other creditors, certainly 15% interest would be inequitable, for in terms of money the latter would penalize other creditors more severely than the former.

■■■ That an enforcible agreement existed between NAC and the debtor under Illinois law likewise is not of controlling significance here. That Illinois law may not afford any usury protection to corporate borrowers does not mean that creditors of a bankrupt corporate borrower are equally without protection after bankruptcy. The delay in repayment of NAC of its loan since bankruptcy is occasioned by the necessary bankruptcy procedures for the protection of all creditors, including NAC. In the opinion of the Court, to allow NAC interest at the rate here contracted would be highly inequitable to the other creditors, even though the security may suffice to pay NAC its principal and such interest. Neither can this Court substitute a lower rate of interest not .contracted for. The Court is therefore of the opinion that its former decision disallowing the payment of interest from and after

the date of filing of the reorganization petition should be sustained.

■■■■■ With respect to the allowance of attorney fees and costs after bankruptcy, the equitable jurisdiction of this Court is the same as with respect to the allowance of interest. In its former opinion the Court allowed all costs incident to NAC's replevin action and allowed reasonable attorney fees incident to the replevin action. No attorney fees or costs were allowed incident to the proceedings in bankruptcy.

The problem here confronting the Court is that the Trustee has in good faith and not without apparent good cause resisted the efforts of NAC to assert its claim as a secured creditor and to enforce its lien. This action was taken by the Trustee for the benefit of all creditors. NAC, obviously for the sake of minimizing taxes in Tennessee and of earning interest in excess of that allowed in Tennessee, chose to conduct its business in a manner that raises serious legal issues as to the legality of its operations in Tennessee and such as would reasonably be calculated to invite litigation in this State.

The extensive and prolonged litigation incident to the enforcement of NAC's claim as a secured creditor, with increased legal costs thereby being incurred, has been caused by the manner in which NAC chose to conduct its business. It seems most inequitable to this Court that NAC should deliberately skate upon thin legal ice in order to minimize its taxes and increase its interest, then be allowed to recover its full legal expenses caused and incurred almost solely by reason of the legal risks it chose to take, all to the detriment and penalty of other creditors of the bankrupt. The Court is not here weighing equities between NAC and the bankrupt who dealt with each other at arms length, but rather between NAC and creditors of the bankrupt. In the eyes of this Court equity and justice require that NAC's legal expenses incident to these bankruptcy proceedings should not be shifted to other creditors. but rather should be borne by NAC. The judgment of the Court disallowing payment of attorney fees and costs incurred on behalf of NAC subsequent to bankruptcy will therefore be affirmed.

An order will enter accordingly.