**In the Matter of IMPERIAL '400' NATIONAL INC. et al., Debtors.**

**No. B–656–65.**

United States District Court,
D. New Jersey.
March 4, 1974.

See also 3 Cir., 486 F.2d 297.

Michael R. Griffinger, Crummy, O'Neill, Del Deo & Dolan, Newark, N. J., for Thomas J. O'Neill Trustee.

Jerome Feller, Securities & Exchange Commission;. Charles Stanziale, Newark, N. J., and Sidney Markley (New York Bar), for Continana.

David M. Satz, Jr., Norman E. Schlesinger, Newark, N. J., and Conrad B. Duberstein (New York Bar), Brooklyn, N. Y., for American Realty Trust.

Hannoch, Weisman, Stern & Besser by Ronald M. Sturtz, Newark, N. J., Carter, Ledyard & Milburn by Edward F. Clark, Jr., and Jack Kaplan (New York Bar), New York City, for Schiavone Const.

Morrill J. Cole, Cole, Berman & Belsky, Paterson, N. J., for Burnham Group.

Alvin Weiss, Riker, Danzig, Scherer & Brown, Morristown, N. J., for General Tire Pension Fund.

Roger C. Ward, Pitney, Hardin & Kipp, Newark, N. J., for Marine Midland Bank.

Sheldon Schachter, Kleinberg, Moroney, Masterson & Schachter, Newark, N. J., for Unsecured Creditors Committee.

Theodore S. Meth, Newark, N. J., for Co-Owners.

Bernard Hellring, Newark, N. J., for Stockholders Committee.

Laurence W. Levine, Walsh & Levine (New York Bar), New York City, for Union Bank.

## OPINION

WHIPPLE, District Judge:

### I. *Introduction*

This Court has before it four proposed Plans of Reorganization which have been forwarded to the SEC as being "worthy of consideration" and have been reviewed by that advisory body.[1] It is now my duty to determine whether one or more of the proposed Plans are fair, equitable and feasible, Bankruptcy Act, § 174.

In order to reach this determination, I have had the opportunity to preside over hearings in this reorganization for more than one and one-half years, have reviewed transcripts of prior hearings, have examined extensive exhibits, briefs, two SEC advisory reports, arguments and submissions of counsel. The extensive nature of these 9-year old proceedings have been attributable, in part, to the rarity of a Chapter X Court having not one, but four Plans from which to choose (not to mention earlier plans and earlier versions of the current Plans).

If more than one Plan is found to be fair, equitable and feasible, I conceive it to be the duty of the reorganization court to submit all such Plans to creditors and stockholders for their consideration. The language of Sections 174 and 175 of the Bankruptcy Act so indicates and such a policy seems to be codified in proposed Rule 10–305 of the proposed Chapter X Rules.[2] Notwithstanding this mandate, circumstances could arise, even in this case, whereby delay, confusion and the probability of no Plan being approved might persuade a Reorganization Court to consider special procedures when more than one Plan meets the statutory criteria. See, for example, In the Matter of Riker Delaware Corporation, No. B–597–67 (D.N.J., April 22, 1971); Heuston, Corporation Reorganizations under the Chandler Act, 38 Colum.L.Rev. 1199, 1217 (1938); In re Pressed Steel Car Co. of N. J., 16 F. Supp. 325, 326–327 (W.D.Pa.1936). Because of the conclusion reached herein with respect to the four Plans, I need not deal at this time with this thorny issue.

### II. *Valuation of the Debtor*

■ The Judgment Order of the United States Court of Appeals for the Third Circuit dated October 16, 1973 affirmed this Court's valuation of the debtor corporations. 487 F.2d 1394. That Judgment Order, however, noted that the valuation "is subject to reconsideration" and may be revised, particularly in the light of continuing disputes "concerning appropriate interest deductions". One of the disputes pertaining to interest deductions involved the selection by this Court, in projecting future earnings, of an 8% interest rate on debt existing in the reorganized company. The selection of an 8% interest rate was premised upon a number of considerations, one of which was that the reorganized company would, in fact, have a

1. Supplementary Advisory Report of the SEC on Proposed Plans of Reorganization, dated August 29, 1973, Corporate Reorganization Release No. 313 (hereinafter "SEC"). An earlier Advisory Report (Corp.Reorg. Release No. 312 dated July 12, 1972) has also been carefully considered in the formulation of this opinion.

2. Preliminary Draft of Proposed Bankruptcy Rules and Official Forms under Chapter X of the Bankruptcy Act (1972).

modified debt structure, i. e., that some revision of the present debt structure or new borrowing would occur.

This point was challenged by Continana Corporation, ("Continana"), a proponent of a Plan of Reorganization, in its appeal from this Court's valuation determination. Continana took the position, in that appeal, that the debtor need not refinance, nor borrow additional funds, nor in any way disturb the existing debt structure. Subsequent to the filing of its brief furthering this contention in the Court of Appeals, Continana filed an amendment to its amended Plan which stated that its Plan now contemplated a distribution of $1,500,000 in cash and 1,100,000 shares of stock to creditors and stockholders of the debtor. The source of the $1,500,000 in cash was stated to be the funds of the debtor in excess of current needs and a borrowed sum. As Continana stated:[3]

> "Imperial with a net worth of $8,000,000 under the internal plan could easily borrow up to $700,000 in order to fulfill its commitments under its plan."

Thus, it is clear that notwithstanding its protestations in its appeal that no new borrowing was required, the Continana Plan very definitely envisions the possibility of borrowing.

Other proponents similarly indicated that a restructuring of debt or the creation of new debt is a very logical possibility. At final argument, the Schiavone representatives stated that while the Schiavone Plan does not require borrowing, Schiavone would formulate its policy with respect to debt "in the exercise of ordinary business judgment."[4] The Burnham Plan has borrowing as an essential component thereof. See Article IV of the Burnham Plan. And the record is replete with reference to restructuring and refinancing insofar as the testimony of the ART Plan representatives was concerned.[5]

In the light of these respective Plan provisions and statements, and the reasons set forth in my opinion on valuation, I see no reason to alter my conclusion that debt in a revised form will exist in the reorganized company and that 8% is an appropriate interest rate to utilize in projecting future interest expense.

Another valuation element left open by the United States Court of Appeals for the Third Circuit,[6] is the value, of the net operating loss carryforward of which Imperial might be able to take advantage. In response to my request, I received an extensive opinion letter from counsel for the Trustee representing alternative computations and legal analysis with respect to this alleged asset of the debtor.[7]

The first determination I must make before I can reach the question of the value, if any, of this asset is whether or not the creditor-claimants in this reorganization are entitled to interest on indebtedness owed to them. I conclude that such creditors are entitled to interest since the debtor is clearly solvent. City of New York v. Saper, 336 U.S. 328, 69 S.Ct. 554, 93 L.Ed. 710 (1949); 6A Collier on Bankruptcy, § 9.08 (at p. 202) wherein the author states:

> "In the case where the proposed Plan calls for payment to the creditors of 100% of their claims, which assumes the estate is sufficient for payment of 100 cents on the dollar, then certainly post-petition interest should be allowed on all claims . . . [I]nter-

---

3. Letter from attorney for Continana Corporation to Court dated November 1, 1973, at p. 3.

4. T., October 24, 1973, p. 23.

5. T., August 21, 1972, p. 100; T., December 5, 1972, pp. 396 through 399 and T., December 6, 1972, p. 498; T., March 8, 1973, pp. 3 through 19; T., March 12, 1973, pp. 13–19.

6. Judgment Order of the United States Court of Appeals for the Third Circuit dated October 16, 1973.

7. Letter from Crummy, O'Neill, Del Deo & Dolan, attorneys for Trustee, to Court dated January 18, 1974.

est to the date of payment would seem essential before anything is turned back to the debtor or its stockholders."

As stated in *Collier*, the "absolute priority rule" requires the payment of such interest. Northern Pacific Railroad Co. v. Boyd, 228 U.S. 482, 33 S.Ct. 554, 57 L.Ed. 931 (1913); Case v. Los Angeles Lumber Products Co., 308 U.S. 106, 60 S.Ct. 1, 84 L.Ed. 110 (1939).

■ With respect to interest on instruments that specifically set forth a contractual rate of interest, interest computed at the contractual rate will be a proper portion of the claim, Ruskin v. Griffiths, 269 F.2d 827, 830 (2d Cir. 1959), cert. den., 361 U.S. 947, 80 S.Ct. 402, 4 L.Ed.2d 381 (1960), unless modified by previous or future court orders for good cause, Vanston Bondholders Protective Committee v. Green, 329 U.S. 156, 67 S.Ct. 237, 91 L.Ed. 162 (1946), reh. den., 329 U.S. 833, 67 S.Ct. 497, 91 L.Ed. 706.

■ With respect to general creditors, the SEC suggests [8] that "claims not bearing a contractual rate of interest are entitled to the governing legal rate". The rate used by the SEC is the maximum legal mortgage interest rate. This rate has varied in New Jersey since the commencement of these proceedings and averages out to 7.02% from the beginning of the proceedings to December 31, 1973. For purposes of simplifying these proceedings and expediting consummation, I will allow general unsecured creditors 7% on their claims from the commencement of the proceedings until the entry of an Order of Confirmation of a Plan of Reorganization.[9]

■ Having established the fact that interest will be paid to creditors, the question then becomes when that interest accrued and was deductible. Interest on instruments with fixed interest rates appears to be deductible on a year-to-year basis throughout the proceeding. However, interest on general unsecured debt may accrue either on a year-to-year basis throughout the proceeding or in 1973, when I determined the debtor to be solvent. Only in the latter circumstance does the net operating loss carryforward appear to have a positive value.[10] The after-tax value, in such case, could range as high as $415,000.

I have considered the opinion letter of counsel and the briefs of the parties filed in the United States Court of Appeals for the Third Circuit. I still believe that the value of the net operating loss carryforward, while existing, is speculative. Some of the factors leading me to this conclusion are:

1. The timing of the accrual and deduction of interest is the subject of conflicting theories. The ultimate disposition of any claimed deduction is, therefore, unpredictable.

2. If a deduction were taken for interest on general unsecured debt in 1973, the Internal Revenue Service might decline to permit the deduction and quite probably would litigate the issue.

3. Not every proponent may be able to take advantage of the net operating loss carryforward. Moreover, the availability of the carryforward as an offset against profits may well come to an end in 1974, limiting its future value.

8. SEC, p. 6.

9. The precise interest rate to be employed does not appear to be a matter of settled law. The SEC cites In re Muskegon Motor Specialties, Inc., 366 F.2d 522, 528–529 (6th Cir. 1966) and In re Norcor Mfg. Co., 36 F.Supp. 978, 980 (E.D.Wis.1941) for its conclusion that the legal maximum mortgage rate is the appropriate rate. Those cases speak of a "statutory" or "legal" rate. Such references could, in New Jersey, mean the rate of interest allowable on judgments (6% under R. 4:42–11 of the New Jersey Court Rules, eff. January 31, 1972) just as easily as the maximum permissible mortgage rate. Absent compelling authority, my selection of 7% does not appear to violate any principles of the Bankruptcy Act or the cases under Chapter X. See also In re Leeds Homes, Inc., 222 F.Supp. 20 (E.D.Tenn. 1962), aff'd, 332 F.2d 648 (6th Cir. 1964).

10. Letter, op. cit., footnote 7, p. 12.

4. The preservation of a pre-proceedings net operating loss carryforward to offset post-proceedings profits is seldom allowed by Internal Revenue Service or the courts.

5. At best, the attempt to preserve and utilize the net operating loss carryforward might well result in considerable legal and accounting fees in the furthering of the contentions in favor of availability of the net operating loss carryforward.

I conclude that it is appropriate to substantially discount the alleged value of the net operating loss carryforward. For the purposes of this opinion, it is my determination that the net operating loss carryforward has a value in the range of $100,000 to $200,000.

At the end of my opinion on valuation, I indicated that the precise figure for excess cash on hand in the debtor corporation could not be known until administration expenses were allowed, other adjustments made and "the exact cash to be turned over to the reorganized debtor is known." At the final argument on the respective Plans of Reorganization, the Trustee furnished this Court with an updated schedule of cash balances.[11] I have reviewed this submission and it does not appear to be inconsistent with my earlier conclusions pertaining to probable excess cash.

■ Moreover, neither the precise amount of cash on hand at consummation nor the precise value of any available net operating loss carryforward is a critical factor for the determinations to be made in this opinion. It need only be shown, in my view, that creditors and stockholders receive full value under any approved Plan of Reorganization for the rights and values they surrender. In other words, to be "fair" a Plan must distribute cash, securities or other items of value to creditors and stockholders in an amount equivalent to their rights (debt or equity) in the debtor.

■ Accordingly, modest fluctuations in the excess cash ultimately on hand at consummation or the realized value of a carryforward tax loss should not alter the "fairness" of a Plan. Of course, any material variation in the debtor's assets, be it cash or otherwise, between the time of Plan approval and confirmation or consummation would permit modification of a Plan to do equity to all parties. In re Deep Rock Oil Corporation, 113 F. 2d 266 (10th Cir. 1940), cert. den., 311 U.S. 699, 61 S.Ct. 138, 85 L.Ed. 453; Bankruptcy Act § 222.

Proponent Continana suggests a valuation for Imperial of approximately $14,000,000.00 plus such value as might be determined to be attributed to the net operating loss carryforward. This contention is based in part upon the selection of a multiple of 22 by Continana as opposed to the capitalization rate of 20 used in my previous valuation determination. Continana also furthers its contentions made here at the valuation hearings and in the Third Circuit on appeal pertaining to interest rates, excess cash and the net operating loss carryforward.[12]

Since I have dealt with each of these contentions, the only adjustment that I choose to make is the addition of a value, as stated above, for the net operating loss carryforward. I find no major alteration in the operations of Imperial nor any facts that indicate such a change of circumstances as would warrant a total reconsideration of my previous valuation determination. The continuity of operations here is quite different from the set of circumstances existing in TMT Trailer Ferry v. Anderson, 390 U.S. 414, 88 S.Ct. 1157, 20 L. Ed.2d 1 (1968).[13]

---

11. T., October 24, 1973, pp. 10–11.

12. Letter from counsel for Continana Corp. to Court dated November 1, 1973.

13. In the TMT case, the Supreme Court discussed the "hotly competitive market" which was experiencing "a severe rate war" and "substantial technological change." Additionally, that debtor's principal market was undergoing "considerable expansion". The debtor was on the verge of replacing its fleet of vessels. The Supreme Court criti-

By stating that a total reconsideration of the Imperial valuation is unnecessary, I do not mean to state that I am not cognizant of recent economic and business changes that have occurred internationally, nationally and in the business in which Imperial presently finds itself. I am aware of the decrease in multiples of public companies in the hotel/motel industry since the close of the hearings, and I am well aware of the impact that the current "energy crisis" may have on motel revenues. I am also aware of the fact that Imperial's motel locations are basically in downtown areas as opposed to locations along interstate highways. This latter fact may be considered a positive force. But to continue to speculate and revise valuation determinations would be an unproductive exercise absent seriously changed circumstances. Rather, in light of the recognized inexactitude of any valuation, Consolidated Rock Products Co. v. DuBois, 312 U.S. 510, 520–524, 61 S.Ct. 675, 85 L.Ed. 982 (1941); In re Inland Gas Corp., 211 F. 2d 381, 385 (6th Cir. 1954), cert. den. sub nom., Kern v. Williamson, 348 U.S. 840, 75 S.Ct. 45, 99 L.Ed. 662, a final valuation is a desirable end in itself. Thus, I feel no need to speculate further on the subject I have already examined in great depth in my previous opinion on valuation. In re Deep Rock Oil Corporation, 113 F.2d 266 (10th Cir. 1940), cert. den. 311 U.S. 699, 61 S.Ct. 138, 85 L. Ed. 453; Bankruptcy Act, § 222.

Accordingly, I find that the valuation of Imperial of $10,693,000, as found by me in my previous opinion and as affirmed by the United States Court of Appeals for the Third Circuit,[14] should be modified to add a maximum of $200,000 for my valuation of the net op-

erating loss carryforward, bringing the total maximum value for the enterprise to $10,893,000. In reaching this conclusion, I emphasize that this valuation is considered by me to be a tool to aid me in determining whether or not one of the filed Plans discussed below is fair, equitable and feasible. For that reason, the precision of the dollar conclusion is of major, but not overriding, significance.

### III. The Burnham Plan

■ An amended Plan of Reorganization was filed on October 20, 1972 by the Burnham Group. The Plan calls for the creation of a new structure of debt and equity that need not be detailed here. A summary is contained at pp. 11 and 12 of the SEC report.[15]

Brief proofs were presented in conjunction with the Burnham Plan and the Plan was deemed worthy of consideration and sent to the SEC for its advisory opinion. The SEC has analyzed the Burnham Plan and reported to this Court that, in its opinion, the Burnham Plan is not fair and equitable, nor is it feasible.[16] The SEC feels that the cash needed to service the debt called for under the Burnham Plan would severely impair the operations of Imperial. Moreover, it is the view of the SEC that stockholders would be given nothing, which is impermissible in a solvent Chapter X Reorganization. Accordingly, the SEC concludes that the Burnham Plan is not acceptable in the form as filed. The SEC suggests that the Burnham Plan "could be amended to meet the statutory standards," and suggests a method of amendment that would render the Burnham Plan fair, equitable and feasible.[17]

cized the lower Court for ignoring these important developments since the debtor was not "an established company in a static market." While Imperial and the market are both undergoing some change, I do not find the change in the instant case to be nearly as material or substantial as that found in the TMT case. See also footnote 128.

14. Judgment Order of the United States Court of Appeals for the Third Circuit dated October 16, 1973.

15. Supplemental Advisory Report of the Securities & Exchange Commission on Proposed Plans of Reorganization, Corporate Reorganization Release No. 313 (hereinafter "SEC").

16. Id., pp. 39–41.

17. Id., p. 41.

The Burnham Group never amended their Plan either to meet the objections of the SEC or for any other reasons. Rather, the Burnham Group wrote a letter to this Court on September 20, 1973, an extended deadline date for the filing of amendments to existing Plans, indicating "an amended plan is in formulation." [18] The letter indicated that "when the amendment can be presented in good faith with the full financial backing required, it will be submitted to the Court . . ." [19] The letter goes on to outline the proposed amendment, including the substitution of a public corporation, the United National Corporation, as a new proponent. A copy of the 1973 Annual Report of the United National Corporation was enclosed with the letter. The letter concluded with the representation that the letter constituted a "notice of intent" rather than a formal amendment, stating that such amendment should be filed "within a very few days." [20] No further documents were ever filed by the Burnham Group or United National Corporation.

On October 24, 1973, this Court received a telephone call from Mr. Morrill J. Cole of Cole, Berman & Belsky, attorneys for the Burnham Group. The following message received from Mr. Cole was read into the record at the hearing held on that date:

"Mr. Cole, attorney for the Burnham Group, will not appear this morning. The Burnham Group has not been able to complete the amendment for their proposed new plan. The group presently does not have sufficient money in the bank." [21]

In light of the foregoing circumstances, no Order may be entered approving the Burnham Plan. Bankruptcy Act, §§ 174, 216.

## IV. The Continana Plan

An amended internal Plan of Reorganization has been submitted by Continana Corporation, which is a major stockholder in Imperial, owning 89,850 shares.[22] Continana Corporation operates convalescent centers in California.

The Continana Plan as originally filed was a total stock plan whereupon all creditors and stockholders collectively would receive a total of approximately 3.6 million shares of common stock of the reorganized company. The Plan purported to divide the stock of the reorganized company among unsecured creditors, subordinated creditors, preferred stockholders and common stockholders at slightly varying prices per share with senior creditors and preferred stockholders receiving slightly more per dollar of claim or share of stock than junior interests. The per share price was based upon the valuation of the debtor corporations by the Securities & Exchange Commission.

The Securities & Exchange Commission valued the estate at $12,300,000.00 in excess of secured debt but this Court has found a lower valuation. Continana has never amended its Plan to adjust for the different valuation figure determined by the Court which has been modified as discussed above, although one Continana representative (Mr. Fund) indicated he might consider such a course. Notwithstanding the absence of such an amendment, I will consider the Plan on its merits.

The SEC report calls the Continana Plan "unfair on its face to creditors." The basis for this conclusion, states the SEC, is that the Plan allots creditors "only the face value of their claims, or less, in new common stock." Moreover, the SEC notes that the distributions to the junior creditors and stockholders is less than the face amounts of their

18. Letter from Cole, Berman & Belsky, attorneys for Burnham Group dated September 20, 1973.

19. Id.

20. Id.

21. T., October 24, 1973, p. 2.

22. T., November 3, 1972, pp. 2 and 9.

claims, as opposed to the requisite "step-up." [23]

Additionally, the SEC criticizes the Continana Plan for its failure to provide for any cash distribution to creditors. The SEC asserts that the addition of a cash distribution of about $600,000 to creditors would make the Continana Plan fair and equitable.[24] Such cash distribution, the SEC points out, would reduce the new shares of the reorganized company to approximately 1,100,000. The SEC has prepared a table showing proposed distribution and allocation under the suggested amendments.[25]

Subsequent to the filing of the SEC report, Continana amended its Plan by stating that creditors and stockholders would receive $1,500,000.00 in cash and 1,100,000 shares of common stock "in such proportion as the Court may find to be fair and equitable." Additionally, the amendments purport to give certain preferences in liquidation to stock received by creditors and preferred shareholders. No further amendment giving greater recognition to senior rights was filed by Continana.

The Plan itself, as amended, does not indicate the source of the proposed distribution of $1,500,000.00 in cash. I was concerned with this omission and I made specific inquiry on this point of the attorneys for Continana at the final argument on all Plans.[26] The representation made in response to this inquiry was that Imperial would have no trouble borrowing from $300,000 to $700,000 in order to fulfill its commitments under its Plan.[27] Notwithstanding these representations, no letter of credit or commitment from any bank was submitted to the Court to back up this financial undertaking.

 Continana contends that it gives sufficient recognition to senior rights of creditors through the vesting of control of the company in the senior creditors (by dint of their dollar interest in the net worth of the company), by the granting of special voting rights and by the amendment pertaining to a preference on liquidation to creditors and preferred shareholders. Continana cites no authority for the foregoing "extras" given to senior creditors as sufficient to accomplish the recognition of senior rights, a mandatory requirement under Chapter X, Consolidated Rock Products Company v. DuBois, 312 U.S. 510, 61 S. Ct. 675, 85 L.Ed. 982 (1941); In re Inland Gas Corp., 211 F.2d 381 (6th Cir. 1954), cert. den. sub nom., Kern v. Williamson, 348 U.S. 840, 75 S.Ct. 45, 99 L. Ed. 662. Rather, a "step-up" is the "conventional device for equalizing distributions where senior security holders are to surrender their priority." In re Inland Gas Corp., supra.

The Continana Plan does not contain a true "step-up" as a recognition of senior rights of creditors. The slightly different "trade-in" values of the different classes of claims fail to accomplish the "step-up" I find is required when comparable securities are being distributed to various creditor and stockholder classes.

Moreover, the Continana Plan suggests no allocation of cash and securities. Unlike the Schiavone Plan, discussed elsewhere herein, the proponents of the Continana Plan have a distinct interest in setting forth an allocation and a proposed "step-up" since it will very directly affect the interest of Continana in the reorganized company. Thus, Continana might find itself, should the Court impose its own allocation under the Continana Plan, as an appellant dissatisfied with the approval of its own Plan under a Court imposed allocation. And, as noted in the SEC report, an allocation under the "step-up" suggested

23. SEC p. 37.

24. Id.

25. Id., Table XX, p. 38.

26. T., October 24, 1973, p. 114.

27. Id., p. 115 and letter from counsel for Continana dated November 1, 1973.

in the SEC report [28] based upon the evaluation determination of this Court might well reduce the stockholders' interest to a minimal equity.[29] Accordingly, I find the Continana Plan to be deficient in its failure to provide a proper "step-up" and its failure to allocate cash and securities to be issued under the Plan between creditors and stockholders.

Moreover, the questions raised by creditors and others pertaining to marketability of any securities issued under the various Plans is of special concern under the Continana Plan. The problem is particularly heightened by the fact that only Imperial is involved, not a combination of Imperial with another major corporation. This is but another negative factor.

For the foregoing reasons, I find that the Continana Plan, as amended, is not fair and equitable.

In addition to the foregoing, this Court is concerned about the feasibility of the Continana Plan. Feasibility means that the reorganized company will emerge from the proceeding in a solvent condition with reasonable prospects of financial stability and success. 6A Collier on Bankruptcy § 11.07. While feasibility is essentially a question of the ability of the reorganized company to meet its financial obligations, future operations are an additional concern under this statutory standard. *Collier, supra;* Feasibility in Plans of Corporate Reorganization under Chapter X, 61 Harv.L. Rev. 763 (1948); Consolidated Rock Products v. DuBois, *supra.*

In this connection, I note that little, if any, testimony was offered pertaining to the future plans of the reorganized company under the Continana Plan. In fact, Mr. Fund, a Continana witness, testified that he saw no future role of guidance for Continana [30] other than possible participation on a Board of Directors. Under direct examination by his own counsel, Mr. Fund, of Continana Corporation, stated:

"I would think and hope that the creditors . . . [and] the shareholders, would get together and agree on a slate of Directors, and that those Directors would formulate a plan of operation on the company . . ." [31]

Beyond this "hope", Mr. Fund commented upon his concepts of the Board of Directors of the reorganized company and the desirability of the retention of present personnel.[32] While such sketchy testimony might normally be excusable under an internal Plan whereby a successful operating business is to be continued without any substantial changes, it is my view that the reorganized debtor will have to take certain major steps, either in financial restructuring or operational moves, in order to keep pace with the industry and continue to generate attractive earnings. The absence of concrete programs and the sketchy outline of management direction under the Continana Plan are negative factors with respect to the question of feasibility.

As stated earlier, the proposed borrowing to implement the Plan has not been pursued beyond the proposed stage. Considerations of adequate working capital for the enterprise and for limitations upon the discretion of corporate management have not been detailed. See 61 Harv.L.Rev. 763, 777, *supra.*

In fact the proposed capitalization of the reorganized company is not manifest upon the face of the Continana Plan or the testimony adduced with respect thereto. The Court is not in a position to determine what debt will exist and its ratio to equity. The Court cannot determine what back-up capital or credit might exist in the reorganized company. Thus, I conclude that the necessary

---

28. SEC pp. 37–38.

29. Id., wherein the SEC notes:
"The lower value would reduce the common stockholders' equity from 167,644 shares to 16,171 shares worth $171,000."

30. T., November 3, 1972, p. 71.

31. T., October 20, 1972, p. 80.

32. Id., p. 82.

proofs of feasibility, both financial and operational, have not been shown.

For all of the foregoing reasons, this Court is not able to approve the Continana Plan.

### V. The American Realty Trust Plan

An amended Plan of Reorganization has been filed by American Realty Trust, a real estate investment trust with principal offices in Arlington, Virginia. The Plan [33] has subsequently been amended to propose that the co-proponents be American Realty Trust (hereinafter "ART") and Westfield Realty Co. The Plan will be hereinafter referred to as the "ART Plan".

ART is the third oldest real estate equity trust in the nation and, according to one exhibit,[34] the largest owner of hotel and motel properties in the Washington, D.C. area. It engages in sale and leaseback transactions, has interests in commercial properties and mortgage loans and is familiar with all aspects of real estate, equity and mortgage operations. According to its 1972 Annual Report,[35] ART has total assets in excess of $38 million and total annual income in excess of $4 million.[36] The earnings per share of ART have risen from $.37 in 1967 to $1.05 in 1972, and dividends declared per share have risen from $.46 to $.80 in the same years.[37] The shares of ART are publicly traded on the American Stock Exchange and, during the course of most of these proceedings, were selling at approximately $10.00 per share. To demonstrate its financial capabilities, ART produced bank letters indicating that it had an open line of credit to the extent of $6 million.[38]

Westfield Realty Co. (hereafter "Westfield"), the co-proponent of the ART Plan, is in the "total real estate business." [39] Westfield acquires "raw real estate or improved real estate." [40] Westfield improves raw real estate it acquires and then manages all acquired real estate thereafter. The bulk of the real estate operations of Westfield center around Arlington, Virginia or other nearby locations.[41] Westfield produced an unaudited financial statement for the 11 month period of January 1, 1972 through November 30, 1972 [42] which indicated an income for that period of $5,985,072.85, expenses of $4,908,793.18 and a net profit of $1,076,279.67.[43] Additionally, a composite list of assets of the stockholders of Westfield was presented showing substantial equities in partnerships and real estate ventures with minimum liabilities.[44]

The court is satisfied from the foregoing that ART and Westfield are business enterprises of considerable substance and financial capabilities.[45]

The original ART Plan has been supplemented and revised by amendments that do not materially or adversely affect the interests of creditors or stockholders.[46] The essential terms of

---

33. AR-1 and AR-16.

34. AR-11.

35. AR-26. See also AR-12.

36. Id., p. 5.

37. Id., p. 12.

38. AR-3 and AR-4.

39. T., December 15, 1972, p. 6.

40. Id.

41. Id., p. 7.

42. AR-19.

43. Id.

44. AR-25.

45. Notwithstanding the apparent financial health of ART, there is some indication that financial problems may loom ahead for REIT's generally, as a result of current economic conditions. See "Realty-Trust Woes; REIT's Face Shake-Out as Investments Sour, Cash Sources Dry Up", Wall Street Journal, January 21, 1974.

46. The impact of the amendments on co-owners, land lessors, mortgagees and other third parties is another question which is discussed, *infra*. It is perhaps theoretically contendable that an adverse impact upon such a third party could result in an indirect material or adverse effect upon creditors or stockholders. Such, however, does not appear to be the concern of the Bankruptcy Act.

the Plan, insofar as they affect creditors and stockholders, are summarized at p. 10 of the SEC Supplemental Advisory Report. Distilled even further than the SEC analysis, the Plan provides that unsecured creditors have an option to take either cash equal to two-thirds of the face amount of their claim (including interest) or a 15 year, 6½% subordinated convertible debenture of ART equivalent to 100% of the face amount of their claims (including interest). Preferred stockholders would receive the same treatment as unsecured creditors. Common stockholders of Imperial would receive ART shares at the rate of $2.00 in market value for each share of Imperial. Other details pertaining to the securities to be issued, the terms of the Plan and limitations contained therein are detailed further in the Plan as amended, the SEC report, or this opinion.

On August 29, 1973, the SEC Supplemental Advisory Report was filed setting forth an analysis of the proposed ART Plan.[47]

The SEC, after analyzing the financial condition of ART, proceeds to a detailed analysis of the ART Plan with respect to the statutory criteria of fairness, equitability and feasibility. The discussion in the SEC report analyzes fairness in terms of the value of ART based upon its earnings. To this end, the SEC has prepared a table[48] showing the combined income of ART and Imperial, as adjusted. The SEC concludes[49] that pro forma earnings of $.77 compared to the general average price per share of ART stock produces a multiple of about 13.

Having analyzed the earnings picture of ART and Imperial as a reorganized entity, the SEC report then proceeds to evaluate the proposed new convertible debentures offered under the ART Plan. The SEC report also discusses the alternative cash offer. As discussed in more detail below, the SEC concludes that the

ART Plan, as then before the Court, was not fair and equitable.

The SEC called for certain amendments to make the Plan fair and equitable. Such amendments have not been filed. The only amendment filed deals with the relationship of the co-proponents and the co-owners. Thus, if this Court were to apply the yardstick suggested in the SEC report, ART has failed to file an amendment that meets the "fairness" requirements as they are viewed by the SEC.

Before making my own determination of the "fairness" of the ART Plan, it is necessary to discuss several important concerns surrounding the ART Plan and central to my decision of whether or not it may be approved.

A critical question that arises in my consideration of whether or not to approve the ART Plan is the issue of the preservation of the status of ART as a real estate investment trust ("REIT"). Pursuant to § 856 of the Internal Revenue Code, ART is entitled to the tax benefits conferred upon a qualified REIT. In order to remain the beneficiary of these tax provisions, the Internal Revenue Code imposes certain requirements that must be met by a REIT. Of particular interest here are the delimiting requirements pertaining to assets held by a trust, and income received by a trust. I.R.C. § 856(a)-(c). A REIT is permitted to receive "rents from real property.", I.R.C. § 856(d). The ART Plan in its final state expresses an intention that the sole role of ART in the reorganized debtor will be to receive rents from real property either solely or in conjunction with a co-owner.

As the ART Plan has changed and been modified, opinion letters have been submitted to me with respect to the preservation of the REIT status of ART. John F. Rutledge, counsel for American Realty Trust, opined that under the provisions of the Plan as presented to the Court on or prior to

47. SEC pp. 26–36.

48. Table XV, SEC p. 31.

49. SEC p. 32.

August 31, 1972, the status of ART as a real estate investment trust "will not be affected."[50]

Subsequently, this Court received a careful analysis from the tax partner of the firm acting as attorneys for ART in New Jersey.[51] While this memorandum was based upon facts which were subsequently altered by Plan amendments, it is an excellent exposition of the requirements of the Internal Revenue Code and the ability (or inability) of a REIT to become involved in the operations of the reorganized debtor herein.

The question of ART's REIT status persisted throughout the Plan hearings and was highlighted by the friction between ART and the co-owners, outlined elsewhere herein. In February of 1973, ART "ascertained certain additional facts", considered additional testimony and conducted its own "independent investigation", all of which led ART to modify its earlier opinion.[52] This latest modification appears to be consistent with the Plan as subsequently amended.

However, between the February opinion letter of counsel and the final amendment of the ART Plan, ART made application for a revenue ruling from the Internal Revenue Service posing the question of whether or not its proposed procedures to implement its Plan would affect its REIT status. The exact methodology of implementing the ART Plan and preserving the REIT status remained of concern to me not only as a result of co-owner attitudes but also in light of the possible impact upon both the reorganized company and current debenture holders of a loss of the REIT status at a later date.

The revenue request remained with the Internal Revenue Service for several months. In August of 1973, ART withdrew its application for a revenue ruling. Apparently, the present position of ART is that it will apply again for a ruling once this Court, should it choose to do so, declares that it has the power to establish the business relationships between the co-proponents and the co-owners suggested by the ART Plan. Thus, at this posture, no revenue ruling has been obtained.

ART has consistently indicated to this Court that its REIT status was not in jeopardy. However, I deemed it pertinent to make specific inquiry of counsel regarding the effect upon ART should, hypothetically, its REIT status be lost.[53] The answer I received was that ART would take corrective measures, if necessary.[54] I pressed counsel on this issue and the following colloquy ensued:

"The Court: Do I understand you correctly that regardless of whether you maintain your status as an REIT or not, you are still interested in being a successful proponent in this proceeding; true?

Mr. Schlesinger: Yes, because we are confident that we will maintain that status.

The Court: No. Answer the question.

Do you still want this Court to consider you as a successful proponent regardless of whether you lose your status as an REIT?

True?

You are not under oath.

Mr. Schlesinger: I would think so, and I have to discuss it with our clients, but I think that's their view.

The Court: Could be, you say?

Mr. Schlesinger: Yes."[55]

However, a subsequent colloquy with Mr. Broyhill, President of ART, merely produced protestations that ART would

50. Letter from John F. Rutledge, Esq., to Court dated August 31, 1972.

51. See letter dated December 20, 1972 from counsel for ART to Court, together with memorandum and exhibits submitted therewith.

52. Letter dated February 16, 1973 from counsel for ART to Court.

53. T., October 24, 1973, pp. 56–57.

54. Id., p. 58.

55. Id., p. 59.

be in no danger of losing its REIT status. The following colloguy occurred between the Court and Mr. Broyhill:

"Mr. Broyhill: We are not in any danger of losing our status as REIT.

The Court: Excuse me for interrupting you.

Wouldn't that create serious problems with your present creditors and stockholders of ART?

I'm talking about your debenture holders.

Mr. Broyhill: I really don't think it would create too much commotion among our stockholders.

Creditors, maybe.

I doubt that also."[56]

A post-trial memorandum from ART once again concludes that upon the exercise of the power ART contends this Court has over co-owners, the REIT status will be preserved. The memorandum goes on to request that the Court's order approving the ART Plan should provide certain recitals characterizing ART's income from the Imperial motel chain as consisting solely of "rents from real property."[57] I note parenthetically that it is doubtful that such a recitation would in any way be binding upon Internal Revenue Service.

As a result of all of the foregoing, the Court finds itself confronted with a Plan proposed by a co-proponent enjoying special tax status with carefully delineated limitations on its operations. That co-proponent is asking this Court to exercise a power I am not certain that any reorganization court has, and to make specific findings with respect to future income under leases this Court has never seen. No revenue ruling has been obtained under a hypothetical set of facts to aid me. While I do not dispute the carefully detailed opinions of counsel, the absence of a definitive revenue ruling leaves a cloud of uncertainty over the tax status of ART.

Nor does the suggestion by ART that it would apply for a revenue ruling *after* Plan approval aid this Court. Consider, for example, the negative impact of an unfavorable revenue ruling. The ART Plan might be withdrawn in the midst of the solicitation of consents from creditors and stockholders. (I make this statement because I do not feel that ART has unequivocally indicated it would go through with the proposed Plan of Reorganization should loss of its REIT status be the result of consummation of the Plan.) As a further hypothesis, consider whether or not I could confirm the ART Plan if no ruling was received by confirmation. Or consider the possibility of an appeal by the co-owners or another party from this Court's exercise of the power ART contends it has to create the partnerships between co-owners and co-proponents envisioned by the ART Plan. A ruling, if issued under those circumstances (which is doubtful), would, at best, be contingent upon the outcome of the appeal.

Finally, it is appropriate to consider the point touched upon in the colloquy between this Court and Mr. Broyhill quoted above. ART is publicly traded on the American Exchange. Consider the impact of the loss of the REIT status upon stockholders who purchased stock in reliance upon ART holding itself out as a qualified, ongoing real estate investment trust. The same concern would be true of debenture holders, especially those debenture holders purchasing in reliance upon prospectus representations.[58]

---

56. Id., p. 62. Compare earlier testimony of Mr. Broyhill (T., August 21, 1972 at p. 32):
"The Court: Are you going to lose your tax status?
The Witness: No, sir.
The Court: Would you abandon the Plan?
The Witness: I'd have to give it a lot of thought if I'd abandon it or not."

57. Supplemental Memorandum in Support of ART-Westfield Realty Co. Plan after hearings October 24 and 25, 1973.

58. See e. g., ART Preliminary Prospectus dated June 29, 1973 which reads, in pertinent part (at p. 5):
"*Possible Disqualification as a Real Estate Investment Trust.* While the Trust in-

■ It may well be that any potential jeopardy to the status of ART as a REIT under the ART Plan is considerably more imagined than real. Nonetheless, the entire issue remains one of considerable doubt in my mind to the extent that the problem constitutes a very real concern for the future of the reorganized company. This, in turn, weighs against a finding of feasibility insofar as that concept may be defined as "a workable scheme of organization and operation from which there may be a reasonable expectation of success." 6A Collier on Bankruptcy, § 11.07. The Court should avoid approving a reorganization Plan that will result in protracted litigation. See, e. g., Dodd, The Los Angeles Lumber Products Company Case and Its Implication, 53 Harv.L.Rev. 713, 753 (1940).

■ A related but separate concern is that of the future legal relationships of the reorganized company under the ART Plan, both internally and with third parties. With respect to the proposed form of the agreements reordering the partnership interests for the ownership and operation of the motels, little evidence was introduced. A lease agreement between American Realty Trust and the Hospitality Management Company, Inc., dated April 30, 1970 was marked into evidence.[59] There was some indication in early testimony that a comparable lease would be executed between American Realty Trust and Westfield Realty Co., to accomplish the purposes of the Plan.[60]

Subsequently, a proposed form of lease from ART to Westfield was produced by ART and marked into evidence.[61] This proposed lease runs exclusively from American Realty Trust to Westfield Realty, Inc. No mention is made of any co-owner as either a part-

ner and co-landlord of American Realty Trust, nor is any mention made of a co-owner as a partner and co-operator with Westfield Realty, Inc.

In later testimony (in June of 1973), ART submitted a document entitled "Revisions to 'Supplement to and Explanation of Amended Plan of Reorganization proposed by American Realty Trust as of October 6, 1972'". The revisions set forth in this document state that ART, "independent of the co-owners," will enter into a lease with Westfield under which Westfield assumes the responsibilities of ART "as a partner in the operation of motels owned by the partnerships with co-owners." The document goes on to state that:

"Westfield, at its risk, will perform the obligations under the existing co-owner/operator agreement as were performed by Imperial."

While stating that ART "will become the partner of the co-owners", ART goes on to state that no new documents will have to be executed. It is clear from the foregoing that ART (and Westfield) were attempting to create a post-reorganization structure that will neither jeopardize ART's REIT status nor require new agreements. The model or master lease produced by ART,[62] however, was discussed at hearings held six months prior to the revision to the ART Plan discussed above. It is not clear that the proposed master lease is, in fact, either the form or substance of the lease or leases that must be executed to effectuate the Plan.

It was not until the hearings on all Plans had closed, the valuation of the debtor was determined and the SEC Supplemental Advisory Report was filed that ART amended its Plan to definitively outline the relationships of the proponents with the co-owners. ART

tends at all times to operate as a real estate investment trust, if, in any taxable year, the Trust should not so qualify, it would be taxed as a corporation and distributions to its shareholders would not be deductible by the trust in computing its taxable income. . . ."

59. AR–5.

60. T., July 28, 1972, p. 83.

61. AR–20.

62. Id.

and the co-owners will own and lease real property interests to Westfield and the co-owners, who will operate and manage the motels.

This amendment was filed on September 17, 1973, when all that remained of the Plan hearings were the submissions of counsel and the arguments by the respective parties. No form of partnership agreement nor any modified form of a proposed lease were submitted to the Court or to the parties.[63] All that was stated by the proponents of the ART Plan was that the "terms and conditions of the partnerships" between the co-proponents and the co-owners "shall provide the same economic benefits to the co-owners as are available to them under the existing co-owner agreements." [64]

No further explanation of the partnership agreements or the reformation, revision or substitution of real property relationships was provided. The only explanation provided in the supplemental amendment by ART is that the co-owners "legal rights and economic interests will be modified but not impaired." [65] Absent proposed documents for greater explanation of the new relationships, it is difficult, if not impossible, for this Court to determine precisely what is proposed, let alone whether or not this Court has the power to order into effect such a proposal. I am less than satisfied that the proposed new legal relationships between the proponents and the co-owners have been adequately spelled out. For example, in discussing the proposed master lease, the ART witness was asked on cross-examination about the duration of the lease. He responded:

> "I believe it is fixed for ten years. There will possibly be an escalator clause in it."[66]

I have no recollection of further proof as to the content of such an escalator clause being placed in evidence. Other cross-examination on the terms of the lease raised additional ambiguities and uncertainties that have not been clarified on the record.[67] These ambiguities are of particular concern to the Court because it is critical to the maintenance of ART's status as a REIT that the proposed lease pass muster and not cause a disqualification of ART as a REIT, a subject discussed, *supra*.

I find, therefore, that the proposed legal relationships within and without the reorganized company have not been sufficiently explained or documented on the record, nor has the capability to effectuate such relationships been shown. This leads me to the consideration of another separate but related problem, the co-owners.

Approximately half of the motels in the Imperial chain are operated by a partnership of Imperial and co-owners, often a husband and wife residing on the premises. There is no question in my mind that the co-owners are opposed to the concepts and business relationships that would be established under the ART Plan. ART has made a sincere effort to educate and convince the co-owners of the desirable features of the ART Plan. ART met with the Co-Owners Committee in March of 1973 but was met with an extremely negative response.[68] Subsequently, ART distrib-

---

63. The Co-Owners specifically objected to the lack of notice of the terms of the modified partnership arrangement. T., October 24, 1973, pp. 156–7. In light of my conclusion, I need not analyze the due process problems this lack of notice might present. Note, too, that the co-owner agreements are not uniformly standard, but vary from co-owner to co-owner. *Id.*

64. Supplemental Amendment to Plan of Reorganization of ART, dated September 17, 1973, pp. 1–2.

65. Id., p. 3.

66. T., December 15, 1972, p. 23.

67. Id., pp. 24–27.

68. See letter from counsel for Co-Owners to counsel for ART dated March 22, 1973.

uted a 4 page letter [69] to co-owners in advance of a co-owners' convention held in San Francisco outlining its Plan and the proposed future action that would be taken. The co-owner's convention was held on May 21, 1973 and representatives of ART made a presentation to the co-owners.[70] A resolution was adopted by the co-owners following that meeting under which "the co-owners reject the ART Plan and affirm their support of the Schiavone Plan."[71]

I am not concerned, nor does the Bankruptcy Act suggest I be concerned, with the preferences of the co-owners insofar as Plan proponents are concerned. I can certainly understand the alignment of those co-owners with the Schiavone Plan since that Plan offers co-owners the right to purchase 54,300 shares of the reorganized company's common stock at $10.00 a share.[72]

But I am quite concerned with the practical effect that an opposing body of co-owners might have upon the implementation of the ART Plan. Refinancing or restructuring of debt (see discussion, *infra*) would be quite difficult without the cooperation of the co-owners. Moreover, the day-to-day operations of the reorganized company could be severely jeopardized by the negative attitude of co-owners. Consider, for example, the operation of partnership bank accounts, establishment of operating budgets, cooperative advertising, enforcement of uniform standards and procedures and sales, etc. These are

very real practical problems and cannot be ignored, no matter how opportunistic the attitude of the co-owners might appear. As succinctly put by counsel for the co-owners, ". . . these people do not want to work with ART, and that may not be something which is a very legal or impressive thing to say, but it is real."[73]

Aside from the practical problems of creating co-owner partnerships with ART and Westfield, the legal hurdles are also quite real. ART contends that "this Court has jurisdiction and the power necessary" to achieve these proposed relationships. Other parties dispute this contention. I concede, from the following analysis, that there is no definitive authority either recognizing or refusing to recognize such jurisdiction and power.

The statutory jurisdiction and authority of a District Judge sitting as a Chapter X Court is broad; Bankruptcy Act § 115.[74] The reorganization court has broad powers to direct the effectuation of a Plan; Bankruptcy Act, § 227.[75] However, case law does not appear to necessarily carry these broad powers into automatic effect. The cases upon which the proponents and opponents of the ART Plan rely in support of their respective positions have not proven to be dispositive of the precise issues presented here.

For example, the case of In re International Power Securities Corporation, 170 F.2d 399 (3rd Cir. 1948), cited by

69. Letter dated May 15, 1973 from Thomas J. Broyhill, President of American Realty Trust, to co-owners.

70. T., October 24, 1973, p. 160.

71. Id., p. 161.

72. SEC, p. 9.

73. T., October 24, 1973, p. 161.

74. Bankruptcy Act § 115 states:
"Upon the approval of a petition, the court shall have and may, in addition to the jurisdiction, powers, and duties hereinabove and elsewhere in this chapter conferred and imposed upon it, exercise all the powers, not inconsistent with the provisions of this chapter, which a court of the United

States would have if it had appointed a receiver in equity of the property of the debtor on the ground of insolvency or inability to meet its debts as they mature."

75. Bankruptcy Act § 227 states:
"The court may direct the debtor, its trustees, any mortgagees, indenture trustees, and other necessary parties to execute and deliver or to join in the execution and delivery of such instruments as may be requisite to effect a retention or transfer of property dealt with by a plan which has been confirmed, and to perform such other acts, including the satisfaction of liens, as the court may deem necessary for the consummation of the plan."

ART, held that an injunction may issue by a federal bankruptcy court in order to protect its territorial jurisdiction. The broad statement that a federal court, sitting as a Chapter X Court, has such broad powers as it needs to do equity (at p. 402) is not express authority to permit me to take the steps required under the ART Plan.

The case of In re Imperial '400' National, Inc., 429 F.2d 671 (3rd Cir. 1970) involved the enjoining of bankruptcy proceedings instituted in Michigan by the New Jersey District Court. The grounds for the injunction were that consolidation of all actions involving the debtor's motels into one forum was desirable and permissible since Imperial's various co-owners and partnership interests were all "property" within the meaning of the Bankruptcy Act. Consolidation in New Jersey was appropriate because the initial bankruptcy proceedings had been instituted here.

The *Imperial* case, *supra,* is not specific authorization to order the substitution or alteration of the contractual rights of third parties as requested by ART. While the case does indicate that the "partnership business is an integral part of the debtor's entire business operation," this language is merely introductory to the conclusion that "jurisdiction of the partners and partnership in the same court" is contemplated by the Bankruptcy Act. Thus, while the case recognizes the District Court's jurisdiction over the partnership motels, its holding with respect to the power to deal with partners is limited to the exercise of its power to consolidate proceedings in New Jersey; Duggan v. Sansberry, 327 U.S. 499, 511, 66 S.Ct. 657, 90 L.Ed. 809 (1946).

In re Burton Coal, 126 F.2d 447 (7th Cir. 1942), is of no greater precedential value. In that case the Court assumed jurisdiction in a case involving a dispute over the stock of the debtor claimed by both a third party and a creditor. The Court held that disputes which must be settled before the reorganization may proceed are subject to the Bankruptcy Court's jurisdiction. 126 F.2d at 448–449. In the *Burton Coal* case, there was no way to value the debtor corporation's securities without first determining ownership. In the case at bar, no such impediments to reorganization exist.

The cases cited in opposition to ART's contentions are similarly of little dispositive guidance for this Court. In the case of Callaway v. Benton, 336 U.S. 132, 69 S.Ct. 435, 93 L.Ed. 553 (1938), the Court found that a Bankruptcy Court had no jurisdiction over, and could not prohibit a state court from enjoining the sale of property by a non-debtor corporation to the debtor. In the *Callaway* case, the pending state court action concerned the authority of the non-debtor corporation to enter into such a sale absent the unanimous shareholder consent required under Georgia law. The *Callaway* court declined to become judicially involved in a squabble over the validity of the acts of the non-debtor over which state courts had jurisdiction. However, the co-owner relationship here is much more intertwined in the reorganization than the *Callaway* situation. I, therefore, do not read the *Callaway* case as a limitation on the power of this court.

Similarly, the case of In re Panitz & Co., 270 F.Supp. 448 (D.Md.), aff'd, 385 F.2d 835 (4th Cir. 1967) is not controlling. This case deals with a federal court which declined to enjoin a state court foreclosure of real property owned by a partnership in which the debtor's interest in the property was only indirect and could not be controlled or sold directly by the debtor. The case at bar clearly concerns alienable property interests of the debtor over which this court has jurisdiction, In re Imperial '400', *supra.*

The recent case of In re Beck Industries, Inc., 479 F.2d 410 (2nd Cir. 1973), held that a law suit involving a debtor's subsidiary not included in the reorganization was not within the jurisdiction of the Bankruptcy Court. Here, the

debtor and its business relationships are directly involved, rendering *Beck Industries* inapposite.

In light of the absence of specific authority I will consider this legal problem as another factor to be weighed together with all the other considerations I am reviewing herein in order to determine whether or not to approve the ART Plan.

ART adduced considerable proof on the question of the proposed capitalization, or recapitalization of the reorganized company. ART's witnesses clearly indicated that a refinancing would be necessary. Mr. William Brakefield, an ART witness and a principal in Westfield, testified as follows:

"Q. Do you believe that such a refinancing is peculiarly necessary for the running of the motels?

A. Financing is the backbone of the real estate business. With proper financing you have a good real etate deal. With improper financing you have a bad real estate deal. This chain as it sits today is about as badly financed as anything could be." [76]

Comparable testimony was adduced from other ART witnesses such as Mr. William Darter, a mortgage investment counselor who discussed the wraparound mortgage concept as applied to this reorganization,[77] and Mr. Robert Burke, a former CPA presently with ART who discussed the cash flow problems that would occur without the restructuring of mortgage commitments.[78]

This Court was impressed by the financial analysis accomplished by ART and its representatives. A substantial number of schedules were presented to me showing pro forma balance sheets and income statements.[79] Mortgage curtailment and depreciation schedules were

submitted and detailed explanations of the proposed cash flow under the ART Plan were presented.[80] I have reviewed the testimony and examined with care pro forma statements of operations and projected cash flows for the years 1973 through 1977 prepared by Pogash & Company.[81] These documents indicate that an increasing net income before taxes is projected, with a provision made for payment of interest to a sinking fund under the various alternatives that could arise as a result of creditors electing to accept cash or debentures. In particular, these schedules indicate that an excess cash flow should exist over the period projected under virtually all of the alternative possibilities with the exception of a possible circumstance of all general unsecured creditors electing to accept the proffered debentures.[82]

I am impressed by these exhibits and the accompanying testimony that financial feasibility of the reorganized company under the ART Plan is supported by the record. These projections, and other testimony of ART witnesses, make it clear to me, however, that restructuring or refinancing of the present debt of Imperial is a necessary future step that is contemplated, if not mandatory, under the ART Plan.

The precise form of the refinancing or restructuring contemplated by ART and outlined in part in its exhibits is not of critical concern, although more precision as to its plans would have aided this Court in determining feasibility. The SEC concluded, after examining the pro forma capitalization under the ART Plan, that the ART Plan is financially feasible.[83] I am satisfied, notwithstanding the state of the proofs, that ART could restructure or refinance in a manner that would provide acceptable cash flow and a sound financial continuity.

---

76. T., August 21, 1972, p. 100.

77. T., March 8, 1973, pp. 3–21 and T., March 12, 1973, pp. 13–18.

78. T., December 5, 1972 and December 6, 1972, pp. 396–399 and p. 498.

79. AR–13.

80. AR–14, 15 and 17.

81. AR–18.

82. Id., Exhibit B.

83. SEC p. 34.

However, the very need for the refinancing or restructuring anticipated by ART only underscores the problem of the relationship with the co-owners whose cooperation appears necessary to accomplish such restructuring or refinancing. Moreover, in this connection, no adequate record appears indicating that such restructuring or refinancing could be readily accomplished without any obstruction or impediment being raised by land owners from whom Imperial presently leases property, or from present mortgagees.[84] Furthermore, the Court has not had presented to it information sufficient for the Court to conclude that all mortgage instruments now existing permit restructuring or refinancing without any negative consequences.

The interrelation of land owning interests, leasehold interests, mortgage interests and operational interests has not been developed on the record to a point sufficient to permit me to conclude that the plans of ART, which may very well be financially feasible, are in fact legally, practically and equitably feasible. In other words, there is no assurance that an attack would not be mounted (and perhaps be successful) by one of the parties having a present contractual relationship with Imperial, or a third party who relied on such a legal relationship.

With these many unanswered questions in the Court's mind I must, at least, express a healthy skepticism of the ability of ART to accomplish the proposed refinancing or restructuring its witnesses feel is mandatory for the successful future operation of the reorganized debtor.

As stated previously the SEC has concluded that certain amendments pertaining to the debenture/cash offer under the ART Plan could make the Plan "fair". Specifically the SEC has suggested that the cash alternative (two-thirds of the claim in cash immediately) be deleted in its entirety from the Plan [85] and that the proposed subordinated debentures be offered to creditors and preferred stockholders of Imperial "at a rate of 110% of the amount of their claim".[86] ART has declined to make such amendments. It is the duty of this Court to determine whether or not the SEC analysis is correct or, in fact, the ART Plan is fair without such amendments.

Section 174 of the Bankruptcy Act provides that a Plan cannot be approved unless it is "fair and equitable, and feasible." The basic meaning of whether or not a Plan is fair and equitable is set forth in 6A Collier on Bankruptcy § 11.-06. *Collier* discusses the landmark case of Northern Pacific Railroad Co. v. Boyd, 228 U.S. 482, 33 S.Ct. 554, 57 L. Ed. 931 (1913). The *Boyd* case is the basis for what has come to be known as the "absolute priority rule". *Collier* summarizes this rule as follows:

> "Under the absolute priority rule, a plan is not 'fair and equitable' unless

---

84. ART apparently concedes that its Plan will need the affirmative cooperation of lessors and mortgagees. See "Supplemental Memorandum in Support of ART-Westfield Realty Co. Plan After Hearings October 24 and 25, 1973", pp. 9–12, esp. at p. 11 where ART states:

 "Upon approval of the A.R.T.-Westfield Plan, A.R.T. at its expense will secure the approval of the 19 mortgagees and 10 lessors to the extent required. Furthermore, A.R.T. is prepared to refinance or acquire the interests of any mortgagee who may not consent to the change in ownership. Any increase in debt service will be borne entirely by A.R.T. without any cost to the Co-Owners. Recognizing that A.R.T. is a $30,000,000 company and will provide financial stability to the Imperial chain, A.R.T. is confident that it will expeditiously obtain the consent of mortgagees and lessors wherever required."

 A reorganization court has a duty to be less sanguine than an optimistic proponent with regard to expected future events. The record in support of the foregoing prediction is quite limited. Moreover, the future "expense" will not merely be that of ART—it will be that of the reorganized company.

85. SEC p. 33.

86. Id.

it provides participation for claims and interests in complete recognition of their strict priorities and unless the value of the debtor's assets supports the extent of the participation afforded each class of claims or interests included in the plan. Any arrangement by which a junior class received values allocable to a senior class 'comes within judicial denunciation.' Beginning with the top most class of claims against the debtor each class in descending rank must receive full and complete compensation for the rights surrendered before the next class below may properly participate."

The question then becomes, is each class receiving "full and complete compensation for the rights surrendered." More particularly, does either the debenture or cash offer qualify as "complete compensation" which must be afforded creditors prior to any distribution to stockholders?

The first concern is the proposed subordinated debenture offered under the ART Plan. These debentures will be unsecured obligations of the Trust and will be exchangeable, convertible and transferable at the office of the Indenture Trustee which shall be a national bank in New York, New York or Washington, D. C.[87] Interest is payable semiannually at an annual rate of 6½% and the instruments mature 15 years after the date of issue. Provision is made for a sinking fund and retirement of outstanding debentures at the rate of at least 5% of the total principal amount per year.[88] The debentures are convertible into common stock of ART at a price per share equal to 110% of the average market price of ART stock during the 30 days prior to confirmation of the Plan.[89] The evidence presented by ART outlined other pertinent features of the debentures including redemption and modification provisions.[90]

In order to demonstrate the value of the proposed debentures ART produced expert witness, Stuart A. Beringer, an investment banker with W. E. Hutton & Co. in New York. Mr. Beringer concluded that the proposed debenture "would have a fair market value of 93" and would sell at a 2.3% premium over the common stock into which the debentures would be convertible.[91] The SEC did not accept this conclusion but stated that when the debentures were viewed in the valuation terms expressed by ART's own expert, their value was, in any event, insufficient. As succinctly put by the SEC, "$93 worth of debentures cannot satisfy $100 in claims against Imperial." [92] Moreover, the SEC pointed out that the convertibility feature calling for conversion at 110% of the market price for ART shares preserves a built-in discount which thus prohibits creditors from receiving "complete compensation" for their claims. The SEC went on to criticize the degree of subordination [93] of the proposed debentures, the low interest rate of 6½% and the probable equivalency of the two-thirds cash alternative.[94]

The SEC analysis is persuasive. I recognize the right of a reorganization court to modify the capital structure and securities of a debtor undergoing reorganization but I feel compelled to find that the proposed debentures fail to meet the statutory criteria and the standards grafted upon the Bankruptcy Act by the "absolute priority rule". Since there has been no amendment pertaining to the debentures as suggested by the SEC,[95] I find that the proposed debentures do not constitute a fair and equitable offer to creditors and preferred stockholders.

---

87. AR–23.

88. Id.

89. Id.

90. Id.

91. SEC p. 32.

92. Id.

93. The SEC states that ". . . as debt obligations the debentures are deeply subordinated . . ." SEC, p. 33.

94. Id., p. 33.

95. Id.

The alternative offered by ART is to pay two-thirds in cash for the face amount of claims including interest. For much the same reasons stated above, I do not believe the cash offer is fair and equitable. I recognize the attractiveness of the cash offer to major creditors—it is a source of immediate liquidity in return for the surrender of their rights. Such liquidity may not be available under any other provision of any other Plan. However, liquidity or marketability is not the test under the Bankruptcy Act. Fairness is the present concern. The two-thirds cash offer on its face is not complete compensation to creditors.

If the cash offer is intended to be an equitable equivalent of the debentures, then the valuation of the debentures at 93 becomes more suspect. At the least, the cash offer can rise no higher in stature than the debentures. But, more importantly, if the debentures are in fact worth more than the cash offer, the alternative of the cash offer should not exist. The SEC suggests that an unsophisticated or impatient investor might leap at the cash alternative.[96] I feel this point is particularly valid in light of the fact that accrued interest on the claims should aggregate 50% or more of the face amount of the claim, thus entitling each creditor to 150% of the face amount of his claim at the beginning of the proceedings. A two-thirds cash offer would give that creditor 100% of the face amount of his claim at the beginning of the proceedings, giving him the impression he is being made whole. In reality, however, that creditor is entitled to half again as much as he would be receiving. Moreover, he would be foregoing a debenture which, according to ART's witnesses, is worth at least 93% of the face amount of the claim. I, therefore, conclude that the cash alternative is equally unable to meet the statutory standard of being "fair and equitable."

One final area pertaining to ART deserves discussion. Considerable testimony was adduced—primarily by the Schiavone interests—pertaining to transactions in the securities of Imperial conducted by ART and persons affiliated with it. I have sifted through much of this testimony and must state, in all candor, that the apparent contradictions with respect to ownership of Imperial stock have not been adequately explained. It is not necessary to detail the testimony or exhibits surrounding the beneficial ownership of the stock of Imperial—suffice it to say that the transactions between ART, the Trustees of ART, Mr. Aaron Fodiman, individually and Mr. Aaron Fodiman, as Trustee, do not constitute an exercise in lucidity.[97]

However it is not necessary to my decision to ascertain whether or not there has been full compliance with the Williams Act, or other provisions of the Securities Laws. See § 13(d) of the Exchange Act of 1934, 15 U.S.C. § 78m(d) and Rule 13d–1 promulgated thereunder, 17 C.F.R. § 240.13d–101. The specter of litigation arising from noncompliance with the 13d filing requirements is a matter which the Court cannot ignore even if only a remote concern. See, e. g., GAF v. Milstein, 453 F.2d 709 (2d Cir. 1971), cert. den., 406 U.S. 910, 92 S.Ct. 1610, 31 L.Ed.2d 821 (1972); Bath Industries, Inc. v. Blot, 427 F.2d 97 (7th Cir. 1970); Water & Wall Associates, Inc. v. American Consumer Industries, CHH Securities Law Reptr., 93,943 (DNJ 1973). This concern is but another factor that I have weighed in reaching the conclusion with respect to the ART Plan stated below.

Nor will I analyze herein the considerable testimony and numerous exhibits pertaining to stock purchases solicited by Mr. Fund, either on behalf of the

96. Id.

97. See, e. g., testimony of Aaron Fodiman, T., August 23, 1972, p. 318; testimony of Thomas Broyhill, T., July 21, 1972, pp. 156–157 and pp. 161–162; Schedule 13d filed with Securities & Exchange Commission by 10 individuals including Broyhill and Brakefield, together with Aaron Fodiman, Trustee, dated June 29, 1973.

Fund Company, Inc. or Continana. There appears to be a loose relationship between the Fund solicitations, particularly of American United Inns, and ART. See, for example, Exhibits DS–14 through 24 inclusive and DS–37 through 43 inclusive, in which the names of Fund, Westreich (a principal in Westfield Realty), Fodiman (owner either beneficially or as Trustee of stock ultimately obtained by ART or its Trustees) and other persons or banks affiliated with one of the two proponents, Continana and ART, appear. The evidence before me might well be sufficient to raise questions concerning both the "good faith" of the purchasers and their full compliance with securities laws. Bankruptcy Act § 221(3) and (5).

The history of the ART proposal is liberally sprinkled with revisions, changes and amendments. Precisely when hearings on one proposal ended and hearings on a revised Plan began is not well established. Aside from collateral issues, such as stock transactions, very real ambiguities and problems manifest themselves to me under the terms of the ART Plan as it now stands. The ability of ART to preserve its REIT status, the problems ART may have in dealing effectively with the co-owners on both an operational and refinancing level, the power of the Court to implement the ART Plan and absence of fairness and feasibility all lead me to conclude that the ART Plan should not be approved. These factors are made all the more determinative by the existence of other Plans in this reorganization, particularly the Schiavone Plan as discussed below. As stated by the SEC,[98] approval of the ART Plan is light of existing questions "bears on the Court's discretion, particularly if other and competing Plans are free from such or other impediments and can be approved by the Court."

98. SEC p. 35

99. SEC pg. 15–26

100. Amendment dated September 17, 1973 to the Plan of Reorganization Proposed by the

For the foregoing reasons, I do not approve the ART Plan.

### VI. The Schiavone Plan

■ Schiavone Construction Co. (hereinafter "Schiavone") has proposed Plans of Reorganization in the within proceedings, together with amendments thereto. The SEC has conducted an extensive analysis [99] of the Schiavone Plan in its "semi-final" form, the Plan having been amended on September 17, 1973 to reach its "final" form.[100] Prior to this last amendment, the Plan provided that creditors and stockholders would receive $1,500,000 worth of convertible debentures, 100,000 warrants to purchase shares of common stock of a new parent company which would act as a holding company for all the stock of the debtor and Schiavone, and 370,000 out of 2,900,000 shares of that new parent company.

The SEC raised certain objections to the proposal which were considered by Schiavone. The Plan was amended so that in its present form it offers a package of $1,500,000 in cash and 428,661 shares of stock in the new holding company. The debentures and warrants have been deleted but a feature in the earlier Plan providing for the issuance of rights to co-owners to purchase 54,300 shares of the new company, has been retained.[101]

In order to evaluate the fairness of the offer of Schiavone I must determine a valuation for Schiavone in order to ascertain the worth of the stock being offered. If the Schiavone package of $1,500,000 in cash plus 14.2% of the total capitalization of the newly formed holding company (fully diluted) is at least equivalent to or in excess of the value of the rights and value being surrendered by Imperial creditors and stockholders, the Schiavone Plan may be deemed fair. Accordingly, I now turn

Trustee in Reorganization, Schiavone Construction Co. and the Co-Owners Committee.

101. Id.

to a determination of the value of Schiavone.

Schiavone is a construction company with the majority of its revenues generated from successfully bid public contracts.[102] The SEC notes the concentration of Schiavone's business with three public agencies in New Jersey [103] but goes on to observe that Schiavone's evidence indicated that it was "handling varied projects" and was "diversifying its activities." [104] In addition to its heavy road construction work, Schiavone's exhibits supported the contention that it is diversifying into areas such as the construction of pipe lines and bridges.[105] With respect to its bridge operations, Schiavone expects that there will be considerable call for replacement of existing road bridges for safety reasons in forthcoming years,[106] thus offsetting the obvious concern over Schiavone's limited sources of revenue.

An in-depth analysis of the financial condition and earnings picture of Schiavone is contained in the Supplemental Advisory Report of the SEC. Considerable testimony and cross-examination on the financial condition of Schiavone was adduced.[107] Careful consideration was given to the percentage of completion method of accounting as opposed to the completed contract method, and the impact on the true earnings of Schiavone that calculations under each of these methods might have. Not only did the SEC and the Creditors Committee carefully examine the Schiavone witnesses, but other proponents did as well.[108]

I have sifted through all this evidence and do not disagree with the conclusion of the SEC [109] that 5.2 million dollars is an after-tax net income figure "within Schiavone's capabilities."[110] However, the level of net income after taxes that the SEC finds appropriate has only recently been achieved.[111] Moreover, the concentration of Schiavone's work in the public sector, the need for accurate bid estimating, current slow-down in construction and other intangibles, both in the record and in my own concern with the accuracy of projections of future earnings,[112] lead me to conclude that a reasonable projection of earnings for Schiavone, for the purpose of testing the fairness of its Plan, would be 5 million dollars per year in after-tax income. I recognize, as does the SEC,[113] that this projected net income figure might well go higher in the foreseeable future. Conversely, it might go lower. I have selected 5 million dollars as a figure that is representative of a reasonable net earnings plateau for Schiavone against which to test the fairness of the Plan.

In order to complete the valuation of Schiavone, it is necessary to determine the appropriate capitalization rate to apply to its earnings.[114] In my opinion on the valuation of Imperial, I discussed in detail the criteria for determining an appropriate multiplier. As I noted therein, "the rate at which earnings should be capitalized is one of the most difficult problems in the valuation field." Valuation by the SEC in Reorganizations, 55 Harv.L.Rev. 125, 133 (1941). And, as stated in the case of In re Keeshin Freight Lines, 86 F.Supp. 439, 445 (N.D.Ill.1949):

"Consequently, determination of the rate of capitalization tends to be arbitrary, and it has been suggested that

102. DS–32

103. SEC p. 17

104. Id.

105. DS–1–10

106. DS–11

107. DS–12, DS–13 and DS–36

108. See e. g., Transcripts of Hearings on July 26, 1971, July 27, 1971, April 14, 1972, October 6, 1972, October 13, 1972 and November 17, 1972

109. SEC pg. 18–19

110. Id., p. 19

111. See Table VI, SEC p. 17

112. See this Court's opinion on the valuation of Imperial dated May 7, 1973

113. SEC p. 18

114. The multiple of the new holding company is the more critical concern, but to preserve continuity and make a complete analysis, I will first determine the proper capitalization rate for Schiavone.

the best standard available is that the rate should be consonant with 'the risk factor of the particular enterprise, measured largely by its past experience and the experiences of businesses similarly situated.'"

The SEC, in its original report [115] analyzed the price-earnings ratios of five companies "whose operations appear to resemble Schiavone's rather closely." [116] Schiavone has taken issue with the comparability of these five companies although Schiavone contends it compares quite favorably to those companies.[117] I conclude that there are distinctions in the nature of the work performed by these companies as well as their diversification and historical settings.

In order to broaden the comparability base, Schiavone has suggested that this Court consider the price-earnings ratios of eleven companies which include three of the five companies selected by the SEC.[118] The comparison suggested by Schiavone is a weighted average over certain periods in 1971 and 1972. This analysis suggests that the average price-earnings multiple exceeded 18. Although a careful analysis, I find that the inclusion of one company with an exceedingly high multiple distorts the average and that the figure of 18 is excessive. The Schiavone expert apparently recognized this fact when he concluded[119] that the Schiavone multiple should be higher than 14.

ART produced testimony and exhibits of its own pertaining to the proper multiple to apply to Schiavone's earnings. Exhibit AR–21 indicated an 8.8 multiple was appropriate although this figure was revised to 10.5 by a subsequent exhibit prepared by the same witness.[120]

I have considered all the exhibits and testimony, have analyzed the "comparable" companies and their data and have considered the SEC restatement of its conclusion as to the proper capitalization rate to be applied to Schiavone.[121] The SEC concluded that a multiplier of 12 should be utilized. In the memorandum submitted by Schiavone, that proponent suggests that "the court should find that the appropriate price-earnings multiple to use in appraising the value of Schiavone . . . is at least 12." The evidence supports such a conclusion and I so find.[122]

The valuation of Schiavone, therefore, may be determined by multiplying my determination of Schiavone's projected earnings ($5.0 million) times the capitalization rate I have selected. The result is $60 million to which I add the value of excess real estate of $4.0 million,[123] for a total of $64 million.

Having reached my determination of the values of Imperial and Schiavone, individually, I am now able to evaluate the "fairness" of the Schiavone proposal. In order to do so, I must determine the value of the new holding company so that I might test the fairness of the proportion of the reorganized company that will be distributed to creditors and stockholders of Imperial.

115. Advisory Report of the Securities & Exchange Commission on Proposed Plans of Reorganization dated July 12, 1972, Corporate Reorganization Release No. 312.

116. Id., p. 49

117. See DS–33 and DS–34

118. DS–35

119. T., November 17, 1972, pg. 73–85. In this connection, I note in passing that the cases caution against heavy reliance upon a proponent's expert testimony on valuation. Jamieson v. Watters, 91 F.2d 61, 63 (4th Cir. 1937).

120. AR–27. See also schedule submitted by ART accompanying letter from counsel for ART dated May 1, 1973.

121. SEC pg. 18–21

122. In reaching this conclusion, I have been mindful of the fact that comparing Schiavone to one or more companies whose stock is publicly traded is not conclusive of its worth but merely one guide. In re Muskegon Motor Specialties, 366 F.2d 522, 528 (6th Cir. 1966). I have also taken into consideration the limited amount of stock of the new holding company that may be publicly traded following consummation, as well as its concentration. While this factor does not affect economic value, it might well affect or distort "value" in the public marketplace.

123. SEC p. 21. See T., October 13, 1972, pg. 22–26.

The projected combined earnings of the reorganized new enterprise will be the sum of the earnings of Imperial (which I shall round to $500,000 per year for this analysis) and Schiavone ($5,000,000 per year), or $5.5 million. What capitalization rate should be applied to these earnings?

I have already reviewed much of the testimony on multiples, supra. Do I apply the Schiavone multiple or the Imperial multiple to the reorganized company? Or do I select a multiple in between—or greater—or even lesser?

The empirical data would indicate that the multiple should be closely akin to that of Schiavone since the bulk of the earnings (91%) I project will be generated by Schiavone. The ART expert concluded that the inclusion of Imperial would not affect the basic Schiavone multiple.[124] The Schiavone expert indicated that the addition of motel operations to Schiavone's business would enhance the Schiavone multiple by 10%.[125]

The SEC recommends a multiplier of 12[126] for the new holding company, although no more foundation for such a conclusion appears than the recitation of expert testimony I have just reviewed.

Once again, however, Schiavone has stated that:

". . . it is sufficient for the Court to find . . . that the appropriate price-earnings multiple of the holding company to use in testing the fairness of the Schiavone Plan is at least 12."

This concession (for the purpose of testing fairness), combined with the testimony, exhibits and SEC analysis lead me to select a multiplier of 12 for the new holding company.

I will now utilize the format of Table IX[127] from the SEC Report to complete my "fairness" analysis:

| | |
|---|---|
| Combined earnings | $ 5.5 million |
| Multiplier | 12 |
| Capitalized earnings | $66.0 million . |
| Value of excess real estate | 4.0 [128] |
| Total value of holding company stock | $70.0 million |
| | |
| Per share (2,958,661 shares) | $23.66 |
| Fully diluted [a]—Total value | $70.5 million |
| Per share (3,012,961 shares) [a] | $23.40 |

[a] assumes exercise of rights by co-owners on 54,300 shares at $10.00 per share.

Having established a combined net worth of $70 million, it is quite simple to determine whether the cash and stock

124. T., December 19, 1972, pg. 53–55 and 66

125. SEC p. 21

126. Id.

127. Id.

128. It is arguable that excess cash of Imperial and/or some value for the net operating loss carryforward should be added at this point to determine the total value of the holding company stock. I have considered this possibility and I decline to make such an addition. The Schiavone Plan calls for a $1.5 million cash distribution which will come from Schiavone or from the marriage of the two enterprises. The remaining combined cash of the two companies will be operating cash and, in my view, will no longer be "excess". The excess cash determination is really an Imperial valuation element bearing on fairness as opposed to a combined entity valuation add-on.

The net operating loss remains speculative, may or may not be available to Schiavone, I.R.C. § 269, is of indeterminate specific value and, depending upon the date of confirmation, of utility only in 1974 (in all likelihood), leaving little, if any, future value to the reorganized new company.

Moreover, with respect to the contention that the increased values of property of the debtor should increase the valuation, see e. g., In re Denver & Rio Grande W. R. Co., 150 F.2d 28, 36–37 (10th Cir. 1945) wherein the Court stated:

"It is not claimed that of the securities issued under the capitalization authorized by the Commission, more has been set over to the Senior Bondholders than is required to satisfy their claims in full, with the exception of the items hereinafter noted. But the argument is made that the capitalization should be increased by virtue of the permanent improvements made from net earnings during the receivership and by virtue of the large amount of current assets so as to afford more securities or common stock for the General Bondholders. We have already disposed of the contention that the earnings which were invested in permanent improvements and betterments should be reflected in increased capitalized value, and nothing further needs to be said on this point."

to be distributed to Imperial creditors and stockholders is "complete compensation". The Imperial interests are being offered a package of $1.5 million in cash plus 14.23% of the equity (fully diluted) of the new holding company. The total offer, therefore, is:

| | |
|---|---|
| Cash | $ 1,500,000 |
| Stock (14.23% of $70,500,000) | 10,030,000 [129] |
| Total Offer | $11,530,000 |

This offer exceeds the total maximum valuation figure I have determined, *supra*, for Imperial of $10,893,000. In the sense that the total consideration offered by Schiavone is at least equivalent to the value surrendered, the offer is fair.[130] I note in this connection that the SEC found the Schiavone Plan fell "within the range of fairness" when its calculations showed that Schiavone offer to be more than $400,000 *less* than Imperial's valuation.[131] The "equitable equivalency" found under those facts is certainly present under the financial facts as I see them.

If the total package is a "fair" offer, is the compensation to each class also "fair"? In other words, is the Schiavone Plan fair and equitable as those words are used in Chapter X of the Bankruptcy Act? I am unable to answer that question since the Schiavone Plan makes no allocation among creditors and stockholders. I will, therefore, determine what I deem to be an appropriate allocation and will permit Schiavone to amend its Plan to accomplish this allocation which, in my view, will render the Plan fair and equitable.

The interrelation of subordinated debenture holders, other lenders and non-loan general unsecured creditors is a difficult and circular concept with which I have already dealt in my opinion classifying such creditors in this reorganization.[132] I have considered the approach of the SEC [133] to the respective interests of these creditor classes and the significance of the subordination provisions of the trust indenture *vis a vis* fairness and feasibility. I find that the SEC's approach is wholly consistent with my views and I specifically adopt that approach for the purpose of reaching a fair and equitable allocation of the consideration being furnished by Schiavone to the Imperial creditors and stockholders.[134]

The SEC analysis makes its suggested allocation based on a per share value of $24.19. This allocation [135] "allows approximately 110% in stock to Imperial creditors" [136] to recognize the superior rights of senior creditors. The Creditors Committee contends that the SEC calculation only provides a 8½% "step-up" and is insufficient.

The theory underlying the need for a "step-up" in favor of senior creditors has its roots in the case of Consolidated Rock Products v. DuBois, *supra*, which recognized the need to give creditors "compensation for the senior rights which they are to surrender" when stockholders are participating in a Plan. The case does not deal with the question of whether a disproportionate distribution of cash to senior creditors might, at least in part, constitute such "compensation". Other authority in this area

129. $10,030,000 is a rounded figure and is equivalent to the product of the shares allocated to the Imperial interests (428,961) times the per share price I have determined (fully diluted) of $23.40.

130. The Creditors Committee concurs in this conclusion. See letter from counsel for Creditors Committee to Court dated October 31, 1973, p. 1.

131. SEC p. 26.

132. See Opinion on Classification of creditors and stockholders dated February 5, 1973.

133. SEC pg. 12–15.

134. While my opinion on classification is designed for the determination of voting classes as opposed to rights under a given Plan, anything in that opinion inconsistent with this determination shall be deemed modified to conform to the determinations made herein.

135. SEC, Table XI p. 25.

136. Id.

gives this Court wide latitude since the concept of a "step-up" may be readily recognized but rarely analyzed. See, e. g. In re Inland Gas, *supra*, 211 F.2d, at p. 385.

An argument that the creditors are the true "equity" participants in the debtor and are, therefore, entitled to a great deal more than the face amount of their claim plus interest, however, is contrary to the decisional law. In Knight v. Wertheim & Co., 158 F.2d 838 (2d Cir. 1946) the court stated:

"We cannot agree that the debenture holders had as yet any legally protected interest in the property beyond the principal and accrued interest of their bonds, which could be weighed against the shareholders' interest. If in fact they had relied upon sharing in any equity in the property above that amount, it was without warrant of law and constituted no reason for depriving the shareholders of whatever chance might remain of realizing upon their property. . . . Until [final decree] creditors remain creditors;

they have their claims and that is all they have; any 'modification' which guarantees them principal and interest on those claims, secures all the rights that a court need regard."

Having clarified the status of creditors, I must now determine what allocation of the cash and securities, including a possible "step-up", will produce the compensation for surrendering senior rights envisioned by Consolidated Rock Products v. DuBois, *supra*.

In light of the foregoing authorities and the inclusion of $1,500,000 in cash in the Schiavone "package", I conclude that the allocation and "step-up" analysis suggested in the SEC's Supplemental Advisory Report,[137] as modified herein to conform to my findings, is an appropriate method of "compensating" creditors for their surrendered senior rights while still doing justice to the interests of stockholders.

The following table is a modification of the SEC computations giving effect to the $23.40 per share value discussed, *supra*:

TABLE XI

(Adjusted)

*Per $1000 of Claim or Per Old Share*

| | Cash | New Shares | Total[b] Value |
|---|---|---|---|
| Senior indebtedness | 244.46 | 35.5 | $1,075.16 |
| Other debt | 163.00 | 39.3 | 1,082.62 |
| Subordinated debentures | | 47.0 | 1,099.91 |
| Preferred per share | | 6.8 | 159.4 |
| Common per share | | 1:14.25 | 1.64 |

*Approximate Aggregates*

(000's omitted)

| Amount of Claim Including Accruals (000's omitted) | | Cash | New Shares | Total Value |
|---|---|---|---|---|
| 3193 | Senior indebtedness | $780 | 113.3 | 3,432 |
| 4415 | Other debt | 720 | 173.8 | 4,787 |
| 1548 | Subordinated debentures | | 72.7 | 1,702 |
| 9156 | Creditors | 1,500 | 359.8 | 9,921[a] |
| | Preferred 1452 shares | | 9.9 | 231[c] |
| | Common 837,722 shares | | 58.8 | 1,376 |
| | | 1,500 | 428.4 | 11,528 |

[a] See appendix for computation of step-up.
[b] At a value of $23.40 a share plus the amount of cash distribution.
[c] Face value plus 6.6% times 9 years, or 159.4% of face.

137. SEC pg. 24–26.

The Creditors Committee urges [138] that a per share value of $21.75 should be used. But under that analysis, only $571,630 worth of stock in the new holding company would be distributed to Imperial common stockholders. This is well below the equity I believe they have in Imperial and I cannot conclude that such a distribution would be fair. Under my determinations, approximately 86% of the Schiavone "package" goes to the creditor interests in Imperial. The ratio of outstanding creditor claims (including interest) to my valuation determination is 84%. This is but another hallmark of fairness and is consistent with the authorities cited herein.

For the foregoing reasons, I conclude that the disproportionate distribution of cash and "step-up" built into the foregoing table in favor of senior interests, constitute a fair and equitable allocation.

With respect to feasibility, I have heard the testimony of the two principals [139] of Schiavone, Messrs. Ronald Schiavone and Raymond Donovan. These gentlemen exhibit considerable management skills in the operation of Schiavone Construction Co., and their testimony also indicated a sound understanding of the future needs for the management of the debtor. The financial record of Schiavone Construction Co. is impressive. It compares favorably with companies deemed comparable to Schiavone by the SEC.[140] No one has seriously challenged the competence of Schiavone's management to handle the combined enterprise in its proposed post-reorganization state.

The financial statements of Schiavone indicate sufficient reserve capital to fund any major operational rehabilitation or change that might be desirable.[141] The prospects for financial health of the new holding company are excellent. Based upon these factors, all the proofs before me, and the authorities cited elsewhere herein, I find the proposed Schiavone Plan feasible.

Concern has been expressed, particularly by the large creditor and stockholder interests, with respect to the market value of new holding company stock as opposed to its investment value. No matter how carefully I may calculate "value", I have no control over what may happen to price in the public market. But my concern under the Bankruptcy Act is value and not price. The comments of the SEC with respect to the ART debentures would appear to be somewhat apposite to the marketability problems suggested by some unsecured creditors. The SEC notes the problem of absorbing a high volume of securities in the market place but goes on to state:

"As an investment, the value they [creditors and stockholders of Imperial] receive may be considered a fair equivalent of their interests in Imperial." [142]

The criticism [143] of the lack of marketability of the securities to be issued under the Schiavone Plan appears to be answered, at least in part, by the Schiavone Plan itself,[144] Bankruptcy Act §

---

138. Letter from counsel for Creditors Committee to Court dated October 31, 1973, and Table I thereto.

139. Exhibit B–3 of April 14, 1972 is a stock purchase agreement for Schiavone Construction Co. dated June 11, 1971. This exhibit shows that Ronald Schiavone owns 510,000 shares and Ray Donovan owns 390,000 shares out of 1,000,000 shares of Schiavone then outstanding.

140. DS–32 and DS–33 clearly indicate that Schiavone is enjoying increasing gross revenues and net income. DS–33 compares the financial data of Schiavone with the five companies deemed comparable by the SEC.

This comparison indicates that Schiavone compares favorably with the five companies, particularly with respect to return on equity and with respect to net income as a percentage of sales. DS–34 expands that comparison and indicates exceptional growth.

141. DS–12 and DS–13, See also T., October 13, 1972 pg. 22–26.

142. SEC p. 33.

143. See Brief of General Unsecured Creditor's Committee submitted prior to final argument, pg. 46–51.

144. Schiavone Plan, amended as of September 6, 1972, Article XV.

264 and the representations of counsel on the record.[145] I, therefore, find that such marketability problem as might exist does not render the Schiavone Plan unfair, inequitable or unfeasible.

### VII. Conclusion

For the foregoing reasons, I approve the Schiavone Plan, subject to it being amended to conform to this opinion, and I decline to approve the Burnham Plan, the Continana Plan and the ART Plan.

There may be additional technical amendments pertaining to the amounts of disputed claims, total shares to be issued, etc. that may be necessary to meet all requirements of the Bankruptcy Act. I would like all such amendments filed promptly, together with the amendment pertaining to allocation.

I direct the Trustee, the SEC and the Schiavone representatives to confer forthwith and to draft and submit an appropriate Order consistent with this opinion.

### APPENDIX

*Computation of "Step-Up"*

I

(000's omitted)

| | |
|---|---|
| Total Creditor Claims | $9,156 |
| Less: Cash Distribution | 1,500 |
| Stock value to be distributed to creditors | $7,656 |
| Plus: 10% "Step-Up" | 766 |
| Total stock value to creditors | 8,422 |
| Add back: Cash Distribution | 1,500 |
| Total distribution to creditors | $9,922 |

---

145. T., October 24, 1973, pg. 14–15 wherein counsel for Schiavone stated:
"The plan is very clear, and if it is not by anybody's reading, we are making it explicitly clear, that it's always been intended that the securities which will be issued to the—anybody who requires registration under the Securities Act of 1933, they will be registered.
The Bankruptcy Act has an exemption for the securities which are issued in the first place to creditors pursuant to a plan.
So that if our plan is approved, and as a result of that securities are given to the Union Bank, General Tire, or whatever, those securities need not be registered, they will not be lettered, they are in no way encumbered by anything on their face.

II

Example:
Senior indebtedness—$1,000 claim

| | |
|---|---|
| Claim | $1,000.00 |
| Less: cash | 244.46 |
| Stock value | 755.54 |
| Plus 10% Step-Up | 75.55 |
| Total Stock | 831.09 |

Number of shares: $\dfrac{\$831.09}{23.40} = 35.5$ shares

They are freely given to these individuals. The approval of this Court is the exemption under the Bankruptcy Act for that purpose.
The next step, however, when the Union Bank, when General Tire, when any other creditor tries to sell those securities in the market, whatever market there will be, that is also covered by the securities law, and there, if those creditors are deemed to be underwriters, under the Securities Act or control individuals by reason of some large block that they may hold, that sale must be registered.
We have provided for that. And if any statement in any opposing paper indicates to the contrary, it is mistaken."